PEOPLE ex rel. JONES v. DIEHL et al., Board of Police.

(Supreme Court, Appellate Division, Fourth Department. July 24, 1900.)

MUNICIPAL CORPORATIONS—CIVIL SERVICE—POLICE DEPARTMENT—CLERK OF BUREAU OF IDENTIFICATION—REMOVAL—REINSTATEMENT.

　　Where the board of police of the city of Buffalo dismissed the clerk of the bureau of identification because of neglect of duty, incompetency, and absence without permission, but the neglect of duty complained of was acts performed by sergeants aiding the clerk when he was crowded with work, and the charge of incompetency was based on the fact that he was not a competent photographer, when the taking of photographs was not a part of his duties, though imposed upon and performed by him, and the alleged absence was on a legal holiday, which was allowed by an order of the superintendent of police, which order had not been revoked; and it appears that the charges were made to give the place to one of the same political faith as a majority of the board, that the removal had been determined on by the board beforehand, that the secretary had been requested to resign by the mayor and the police commissioner to give place to a political friend, and that the removal was not for the betterment of the public service,—the action of the board will be reversed.

Certiorari by the people, on the relation of George T. Jones, against Conrad Diehl and others, composing the police board of the city of Buffalo, to review the action of the board in removing relator from the position of clerk of the bureau of identification and information. Order of removal reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

William C. Fitch, for petitioner.
Henry W. Killeen, for defendants.

SPRING, J. On the 22d day of July, 1896, the relator was appointed by the police commissioners of the city of Buffalo to the office of clerk of the bureau of identification and information, in the police department of said city, and entered upon his duties on the 30th of that month, and retained his position until his dismissal by the defendants June 17, 1899. This bureau was created at the time of the appointment of the relator, and he was its first clerk. He was under the special direction of the assistant superintendent of the police department, and among his duties was the custody of the likenesses which were kept for the especial use of the detective branch of the police force, and he also had charge of the books pertaining to the detective bureau of that department. The relator at the time of his appointment was not a photographer, as the members of the appointing board well knew. Some time after his selection the taking of photographs of criminals was committed to him, and, in a rough, cursory way, he learned the art of photography sufficiently so that during two years of his incumbency he performed this function without any complaint from his superiors, although the character of his work must have been under the frequent review of the assistant superintendent, to whom he was primarily accountable. On the 8th of June, 1898, the plaintiff was summoned before the mayor and Commissioner Rupp, of the police board, and requested to resign.

He testified that he made at the time a written memorandum of that interview, and from it I make the following extract:

"On the 8th of June, 1898, at 10:30 o'clock in the forenoon, Mayor Diehl sent here for me to come to the office in the police commissioners' room. On my arriving there I found the mayor and Commissioner Rupp who greeted me with, 'Good morning.' Thereupon the mayor told me that he had called me into his office for the purpose of asking me for my resignation, on the ground that his friends who had helped him during the campaign should have my position, together with the positions that are now occupied by the Republicans in the police department. Commissioner Rupp then spoke up and said that it was not that they had anything against me, for I had performed my duties faithfully and honestly, but that they looked at it in the light that my position was kind of a halfway political place, and there was no reason why the mayor should not make room for his friends."

The relator did not resign, and the matter seems to have been held in abeyance. Written specifications and charges against the relator were served on him the 9th day of June, 1899, and the notice apprised him that the trial thereof would be had by the board on the 14th day of that month. The specifications accused him of neglect of duty in four distinct particulars,—of disobedience of orders, incompetency, and absence without permission. The resolution of dismissal sustains the charge of neglect of duty as set forth in specification 4 of charge 1, incompetency, and absence without permission. From the undisputed testimony, therefore, we have the board first seeking the resignation of the relator, to give place to a partisan of like political complexion with the major part of the body; then, upon his refusal so to do, preferring charges against him for incompetency and neglect of duty, which are to be tried before the board itself. With a record of this kind, the conduct of the board, even though vested with discretion to decide upon evidence presented to it, must be scrutinized carefully to ascertain if, in the dual capacity of accuser and judge, it has balanced the scales in the latter function.

1. In the plan in vogue, when a prisoner was brought in, his photograph was taken according to the Bertillon system, and his body measurements were then made. The measurements were made by the relator, and noted down on the back of a card or a blotter, and the photograph of the prisoner was expected to be placed on the card. This card, therefore, furnished both the likeness and description of the prisoner, and was placed in the rogues' gallery, and copies were sent to various cities where similar records were kept. The data were also copied in books which formed a part of the Bertillon system. One charge is that occasionally some of these data were placed upon the blotters or cards by one of the police sergeants, instead of by the relator personally. There is no suggestion the entries were improperly made, and the two witnesses who testified to this asserted deflection from duty agree that these entries were made by them, respectively, either because several criminals were in attendance to be measured, or for some other reason the relator was engaged for the moment. The actual measuring was done by the relator, and he called out the figures, which were jotted down by the sergeant, and afterwards they were transcribed in the book designed for their reception. When the data were noted on a card or blotter

to which the photograph was not attached, they were transcribed on the back of the card containing the likeness, and it is also charged that in some instances the transcriptions were made by the police sergeants. Two of these detectives testify to instances of this kind. Each says that he was in the office occupied by the relator; that he was doing nothing, while the relator was apparently engaged, and the detectives voluntarily made the entries. The Grand Army encampment was held in Buffalo in August, 1897, and the work of the police force during that month was largely increased, which added to the labors of the relator; and his work was in arrears on that account, and hence the assistance of the sergeants. The work was properly done, and no one seems to have objected to it until the manner of doing it was spread upon the record, nearly two years later, to found a pretext for the discharge of the relator, in lieu of a less tenable accusation. The charge is without merit, and should not have been dignified by embodying it in the resolution as neglect of official duty. Again, it is contended that there was delay in indorsing these entries upon the cards, and the assistant superintendent of police testified to that fact. It appears, however, that the delay was caused by an accumulation of work in the office, growing out of the large crowds in the city during the encampment. Although the relator was directly under the assistant superintendent, and in an adjoining room, no suggestion was ever made by this important official, in his supervision over the relator, that the latter was derelict or inattentive in the performance of his official duties.

2. The second reason for his dismissal is that he was not a competent photographer. It is to be observed that the duties of the relator are defined in the rules pertaining to the bureau of identification and information; that the taking of photographs of criminals is not imposed upon him by these rules. He was a clerk charged with keeping a record of "the daily doings of the detective sergeants and specials detailed to the detective bureau." He was to keep track of their hours of service, to record the names of the persons arrested, and the bench warrants received, and to have charge of the books in which are transcribed "the data of the persons subjected to the Bertillon system of identification"; also, of the rogues' gallery. He was, therefore, the custodian of the likenesses and of the books pertaining to the detective branch of the police department. It was only after he had been in the department for nearly a year that the taking of photographs was included in his duties. He accepted this service, and therefore should be expected to perform it with a fair degree of precision. It must be remembered, however, that he was entering upon a new field, without preliminary training; that he was engaged, not as a photographer, but as a clerk. And the pith of the performance of this added duty is that he discharged it to the apparent satisfaction of those who supervised his work. It was not expected that his photographic work would show artistic finish. The object was to obtain an accurate likeness,—a clear tracing of the lineaments of the prisoner's face,—and the testimony is that a more precise likeness is obtained without the toning down of the jagged peculiarities which are marks of identification upon the face of every

person. There were no appliances furnished to enable the relator to do work that would show up as an art exhibition. He had no dark room fitted up with sinks and running water, no skylight or slanting window, all of which are regarded as essential requisites to skillful work. Again, the prisoners were not posing before the camera, but were loath to be photographed, and would distort their features, close their eyes, and keep constantly in motion, which added to the difficulty of securing accurate likenesses. Before the appointment of the relator the photographs of criminals were taken by professional photographers, and this practice continued until June, 1897, when the work was undertaken by him, and his work was necessarily crude, especially at the outset; but he continued, however, to perform it, and, so far as the evidence shows, without any complaint of lack of efficiency from his superiors or any of the defendants until the accusation was incorporated in the charges resulting in his removal. Considerable proof was given on the hearing by photographers as to the character of the photographs taken by the relator. Mr. Jansen pronounced two dozen bad out of the seven or eight hundred, and the other experts selected an occasional one, testifying that it had faded or was in some particular defective; but the preponderance of the proof is unmistakably that the work, as a whole, was efficiently done, having in view the appliances furnished, and the fact that the object sought was an accurate likeness to identify the prisoner. Here, again, the assistant superintendent of the department testified that some of the photographs had faded, but still he did not suggest this defect to the relator. It seems that the fading was due largely to the quality of the paper used, and another picture could be had at any time by taking it from the negative. The petition shows that Joseph T. Whitwell was appointed to succeed the relator. That his appointment had been prearranged was an open secret, and had been heralded in the party newspapers of the city. Mr. Whitwell testified that he was, by occupation, a clerk, and the counsel for the relator sought to show that he had never had any experience as a photographer, but this testimony was excluded by the commissioners. While the ruling may have been technically correct, yet if it was the design to oust the relator because he was an inefficient photographer, to give place to another who lacked skill in that art, the proof ruled out might shed some light upon the animus of the accusers of the official occupant. It might also tend to show that the taking of likenesses was not within the compass of the official duties of this clerk. Again, it is a significant commentary upon the fairness of this proceeding that every attempt to show that the appointment of Whitwell had already been agreed upon by the defendants was sedulously excluded by them.

3. The third charge was that on the 30th day of May, 1899, the relator absented himself from duty without leave. This was Memorial Day, and a public holiday. By order of the superintendent of police of July 25, 1898, the hours of five officials of the police department, including the clerk of the Bertillon system, were fixed; but legal holidays and Sundays were excepted, thus permitting these officials to be absent on those days. It is contended by the defend-

ants that a resolution adopted by them April 28, 1899, abrogated the previous order. That resolution reads as follows:

"Commencing May 1st, 1899, and until further orders from the board of police, the office hours of all clerks connected with this department shall be from 8 o'clock a. m. until 4 o'clock p. m., with one hour for dinner; and the Saturday half holiday is hereby abolished. All clerks will attend to their duties during the hours above stated, unless otherwise excused by the commissioners or the superintendent of police. All previous orders conflicting with the above are hereby repealed."

It will be noticed that this does not in specific terms require the attendance of the officials on holidays, and that interpretation should not be given to it unless it is imperatively required, as the policy of the law is to allow officials and employés to be relieved from service on public holidays. There was no specific notice to the relator that this resolution applied to holidays, and no claim is made that he absented himself willfully or with any intention of shirking his duty. His practice had been uniform to be off duty on holidays, and he supposed that was still the rule of the office. This single absence on a public holiday does not constitute a delinquency of sufficient gravity to justify his dismissal from office.

In order that the public service may be maintained efficiently, great latitude is given the board to whom is committed the authority to dismiss an incumbent after a trial upon charges presented. When, however, the obvious purpose is to remove the official because of his political predilections, and to give place to another more congenial politically to the members of the board, a due regard for the efficiency of the service requires that its decision to remove be subject to careful review and scrutiny. The official should not be smirched by sustaining a trumped-up or trivial accusation against him. The adoption of the party shibboleth, "To the victors belong the spoils," would insure better service and be more honorable than to uphold an appointing body in its insincere attempt to make political removals, sheltered under the guise of baseless charges. The fact that the dismissal must be for cause, and upon specific charges, and after the alleged delinquent has had an opportunity to defend or explain the accusations, indicates that he is not to be removed unless the charges are fairly established. As was said in People v. Commissioners, 72 N. Y. 445 (at page 449):

"The removal must be for cause, and the process for removal is prescribed by statute, and must be pursued. The party against whom the proceeding is taken must be informed of the cause of the supposed removal, and be allowed an opportunity of explanation. This necessarily implies that the cause is to be some dereliction or general neglect of duty, or incapacity to perform the duties, or some delinquency affecting his general character and his fitness for the office. The cause assigned should be personal to himself, and implying an unfitness for the place; and such cause being assigned, if unexplained, the removal may be made. An explanation may consist of excusing any delinquency or apparent neglect or incapacity; that is, explaining the unfavorable appearances or disproving the charges. That some other man is a better man than the accused, or more congenial to the appointing or removing power, is not a cause which the incumbent can explain, in the sense in which that term is used, and is no cause of removal, within the statute. That something substantial is intended by the statute is more evident from the fact that the 'true grounds' of the removal are to be entered upon the records, and 'a statement showing the reason therefor' filed in the department."

The power of the board to remove is not an arbitrary one. It is to be based upon charges honestly presented and fairly considered, and the proceeding is of a judicial character, and hence subject to review by writ of certiorari. People v. Nichols, 79 N. Y. 582. As to the charge of incompetency, the relator denied it unqualifiedly, and the question presented for our determination is whether the evidence fairly warranted the conclusion reached. Was the decision against the weight of evidence, to an extent which would require reversing the verdict of a jury? People v. York, 35 App. Div. 430, 54 N. Y. Supp. 835. As we view the testimony, it does not need any reading between the lines to convince us that this removal was not to improve the efficiency of the service, but to find a place for a man of like political faith with a majority of the board. The manner in which the trial was conducted gives force to this suggestion. When the notice was served, the clerk, complying with the directions of the respondents, informed the relator that no adjournment would be permitted. On the hearing his counsel was persistent in endeavoring to secure an adjournment from day to day, but the board was equally strenuous in its refusal to grant this request. On Saturday evening at 7 o'clock, after a protracted session, and with no recess for dinner, the counsel again urged a postponement, and, as theretofore, accompanied his request with an excuse of his own illness; but he was met with the unjudicial rejoinder that the proofs must be in by 9 o'clock that evening, and the decision was rendered at that hour. These are circumstances confirmatory of the criticism that the removal of the relator was intended before the charges were made, and the board were perforce, in this proceeding, simply carrying out the semblance of conforming to the statute.

The resolution and decision of the board of police commissioners of the city of Buffalo is reversed, with $50 costs and disbursements of this appeal to the relator. So ordered. All concur.