MUNICIPAL CORPORATIONS — POLICE COMMISSIONER—REMOVAL — NEGLECT OF MALFEASANCE.

> Under Buffalo City Charter, Laws 1891, p. 170, c. 105, § 184, providing for removal of a police commissioner if he shall neglect his official duties or be guilty of malfeasance or misconduct in office, such a commissioner, who is a member of the police board, which by section 211 (page 177) is made responsible for the general supervision of the payment to and deposit with the city treasurer by the superintendent of police of certain license fees receivable by him, which sections 209, 210 (pages 176, 177), provide shall be so deposited by the superintendent to the credit of the police pension fund, of which the members of the board of police are made ex officio trustees, cannot be removed for relying on the reports of expert examiners of the police fund made from time to time to the city council at the instance of the mayor, instead of making a personal examination of the records and accounts of the superintendent of police and the books and accounts of the city treasurer; such commissioner not being shown to have been guilty of any neglect of his general duties, or of any wrongdoing, or of anything indicating that he is an inefficient or generally negligent police commissioner, or that he has not the capacity or fitness to properly perform the duties of his office.

In the matter of the application of James N. Adam for removal of William D. Doherty from the office of police commissioner of the city of Buffalo. Motion to confirm report of referee denied, and proceedings dismissed.

The proceeding was commenced by the presentation to this court on March 13, 1906, of charges against the above-named William D. Doherty, duly verified by James N. Adam, mayor of the city of Buffalo, charging said Doherty with neglect of his official duties as a police commissioner of the city of Buffalo, and malfeasance and misconduct in office, and asking that he be removed from office by this court. Upon filing such charges an order was made requiring said Doherty to show cause on the 16th of March, 1906, why he should not be removed from office, on which day said Doherty appeared by counsel, and, the matter having been adjourned to March 21st, said Doherty appeared and filed his answer, denying that he has neglected his official duties, or has been or is guilty of malfeasance or misconduct in office. Whereupon it was ordered that it be referred to William A. Sutherland, Esq., of Rochester, N. Y., coun-

selor of the Supreme Court, to take proofs of the matters set forth in the said charges, and report the same to the court, with his opinion thereon. The referee having been attended by counsel of the respective parties, and their proofs having been taken and reported to this court by the referee, with his opinion, the matter came on to be heard at the May, 1906, term of this court, upon the motion by the corporation counsel of the city of Buffalo that the report of the referee be confirmed and said Doherty removed from office.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, NASH, and KRUSE, JJ.

L. E. Desbecker, Corp. Counsel, and S. S. Moran, Asst. Corp. Counsel, for applicant.

George Clinton, Charles L. Feldman, and E. L. Jung, for respondent.

NASH, J. By the charter of the city of Buffalo (chapter 105, p. 127, of the Laws of 1891), it is provided that all police matters of the city shall be under the charge of a department of police, consisting of a board of police, a police force, and such clerks and employés as are therein authorized to be appointed. By section 181 it is provided that:

"The board of police shall consist of the mayor, ex officio, who shall be the president of the board and preside at its meetings when present, and two commissioners of police, who shall be appointed as hereinafter provided (by the mayor), but nothing in this title shall be deemed or construed as making it obligatory upon the mayor to attend the meetings of the said board of police, except when requested in writing by the commissioners of police, or either of them."

By section 184 it is provided that, if any such commissioner shall neglect his official duties or be guilty of malfeasance or misconduct in office, he shall be removed by the Supreme Court at General Term, now the Appellate Division. Section 187 makes it the duty of the board to appoint a superintendent of police and subordinate police officers. By section 192 all members of the police force shall hold office during good behavior, and shall be liable to removal by the board of police after written charges shall have been preferred against them, and the same shall have been published, heard, and examined by the board of police.

A police pension fund is created by the charter, of which the members of the board of police (being the mayor and two commissioners) and the city treasurer are constituted the trustees, with power to grant pensions, to be paid from the fund by the treasurer upon the order or warrant of the board of trustees. Among the provisions for raising this fund are the following: Section 209: By this section the superintendent of police, for an annual fee, is authorized to issue permits to private individuals to carry pistols. "The superintendent shall keep a register upon which shall be entered the name, residence, and occupation of every person to whom he shall issue such permit, the date of issue of renewal, and the fee received for the same; and all the fees so received by him shall be deposited monthly in the city treasury to the credit and for the use of the police pension fund hereinafter mentioned." Section 210: This section provides that the superintendent, either personally or through the captains of the respective precincts, subject to such reasonable regulations as the board may from time to time adopt, shall issue licenses permitting for an annual fee dogs to run at large. "The su-

perintendent shall keep a record of all licenses issued, and shall deposit all fees received therefor with the treasurer of the city, who shall credit the same to the police pension fund. All fines collected under the provisions of this section shall be deposited to the credit of this fund." Section 211 provides that all fees received and fines imposed under the two preceding sections shall be paid monthly by the board of police and deposited with the treasurer of the city, and by him invested or deposited, when from time to time directed by the board. January 1, 1894, there were in the police pension fund $98,208.10. From January 1, 1894, to December 30, 1905, there were received to the credit of the fund $424,709.55. During the same time the disbursements amounted to $357,898.21, and at the close of business December 30, 1905, there was a balance in the fund of $165,019.44.

Section 214 provides that:

"The board [the mayor and two police commissioners] shall, in each year, make an estimate of the sums of money necessary for the administration of the affairs of the department of police, * * * and also for any deficiency which, in the judgment of said board, may arise in the police pension fund in meeting the charges payable out of said fund as hereinbefore provided."

Said Doherty was duly appointed one of the commissioners of police of the city on July 1, 1903, to fill out an unexpired term, and was reappointed on March 1, 1905, for the full term of six years, and duly qualified and entered upon the discharge of his duties, and at all times since has been one of the police commissioners. For 12 years prior to March 1, 1906, Charles A. Rupp was a police commissioner of the city, on which last-mentioned date his term of office expired and his successor duly qualified and entered upon the discharge of his duties. From January 1, 1902, to January 1, 1906, Erastus C. Knight was mayor of the city of Buffalo, and as such was ex officio a member of the police board during said period. On March 5, 1894, William S. Bull was duly appointed superintendent of police, and continued to act as such until the 24th day of January, 1906, when he was allowed and permitted to resign his office. From March 1, 1894, to June 1, 1897, there had been collected for dog licenses by the superintendent of police and deposited with the city treasurer to the credit of the police pension fund $21,172.13. From June 1, 1897, to July 1, 1903, the date upon which Mr. Doherty took office, out of the moneys received by the superintendent of police on account of dog licenses, there had been retained by him the sum of $7,544.68, which was not deposited with the city treasurer. From July 1, 1903, to and including September 1, 1905, there was retained by the superintendent the sum of $4,539.43, received by him from the sale of dog licenses. Thus, on the 1st day of September, 1905, the superintendent was short in the dog license fund account $12,084.11; and of the pistol permit moneys received by the superintendent he failed and neglected to pay over the sum of $200 coming into his hands.

On December 5, 1905, the city treasurer, in a communication addressed to Mr. Doherty, secretary of board of trustees, police pension fund, called attention to the condition of the police pension fund, indicating that there was a shortage in the accounts of the superintendent of

police. At a meeting of the trustees of the fund on the following day Mr. Doherty expressed his surprise, and said they would have the matter looked up at once. Superintendent Bull was called into the meeting by Mr. Rupp, and upon being interrogated by Mayor Knight admitted that there had been no moneys received for dog licenses and pistol permits, deposited from April 30, 1904, to December, 1905, but that he had the funds in the safe, and they would be deposited as soon as possible, stating that he had been more or less derelict in his duty in not depositing these moneys, but that they were getting smaller and smaller every year, and that he did not think they amounted to a great deal. On December 11th he deposited $1,957, on the 13th $1,971.42, and on the 26th $285.42. Before the last of December, 1905, an expert accountant appointed by Mayor Knight investigated this police fund from the beginning of Superintendent Bull's term down to the close of the year 1905, the result of which showed that there still remained in the hands of the superintendent $9,062.40, which had accumulated during that period from these license fees, and which had not been turned over to the city treasurer. This amount was raised on the night of December 29th or the early morning of December 30th, by means of a note executed that night upon which were the names of Commissioner Doherty, Horace A. Noble, the bondsman of the Superintendent, and a friend, Victor R. Blehdon. This note was discounted on the morning of the 30th and the amount of the shortage immediately deposited with the treasurer to the credit of the police fund. On the 26th of December, the superintendent told Commissioner Doherty that the two payments of about $1,900 each be made to the city treasurer on the 11th, and one on the 13th, did not balance the account, but that the expert on the books claimed that there was a deficiency of about $5,000 in addition, which the superintendent said to Doherty he disputed, claiming that he was not able to find some of his receipts from the city treasurer. On the 28th the superintendent told Commissioner Doherty that he had raised the money to clear this balance, and that it would be deposited with the city treasurer on the 29th of December; but on the night of the 29th of December Commissioner Doherty learned that the money had not been raised, that the amount was $9,000 and upwards, and he and the others, as above, assisted that night in raising that amount by means of the above described note. January 3, 1906, Superintendent Bull was interrogated by the mayor as to this fund, and then asserted to the mayor that these moneys had all the while been in his own safe at police headquarters. The fact of his so asserting before the mayor was published in the Sunday morning papers of January 7th and read by Commissioner Doherty. On January 8th the police board held a meeting and the superintendent asked to be suspended during charges. Commissioner Doherty prepared and verified charges against Superintendent Bull January 12th, on which date he knew that he had been deceived by Superintendent Bull on the 26th of December and again on the 28th of December, and that the superintendent had falsified to the mayor on January 3d.

It is claimed that the charges which Doherty preferred against Bull on the 12th of January should have been for something more than mere neglect of duty in failing to turn over these license fees to the

city treasurer, and that Doherty is guilty of misconduct in not having perpared charges of a different character upon the request and under the advice of the corporation counsel. Doherty in his answer admits that he refused to change the charges. The superintendent pleaded guilty of neglect of duty and not guilty to the specifications, and was permitted to resign by Commissioner Doherty and Commissioner Rupp; the mayor refusing to participate. In regard to this claim, the learned referee reports as follows:

"While it is true that the charges against the superintendent might have been more severe, and while the fact of his false statements to Commissioner Doherty and Mayor Adam necessarily led to the inference that the failure of the superintendent to promptly turn over these sums monthly to the city treasurer was owing to something more than mere forgetfulness on his part, yet in view of the outcome of those charges it seems clear to me that no misconduct can now be charged against Commissioner Doherty for not having preferred more severe charges. The fourth charge in this matter is in effect that Commissioner Doherty neglected his official duties and was guilty of misconduct and malfeasance in office, in that he assisted to raise the said sum of $9,000 on the 29th of December, 1905, and in that he did not, in framing charges against Superintendent Bull, charge him with something more serious than neglect of duty for failure to deposit these pension funds with the city treasurer. I am of the opinion that the proofs under this charge do not warrant the removal of Doherty from his office as police commissioner and that charge 4 is not sustained."

The referee finds that Commissioner Doherty was not guilty of the alleged misconduct in drawing the draft upon the fund in favor of the Erie County Society for the Prevention of Cruelty to Animals, and that charge 3 is not sustained.

The remaining charges, 1 and 2, briefly summarized, are as follows:

Charge No. 1: In this charge Commissioner Doherty is charged with neglect of duty and misconduct in office, in that as a member of the board of police he failed and neglected to pay over or cause to be paid over certain sums of money, aggregating $4,739.43, received by the super-intendent of police for dog licenses and pistol permits between the 7th day of July, 1903, and the 1st day of September, 1905, as was his duty.

Charge No. 2: In the second charge Commissioner Doherty is charged with neglect of duty and misconduct in office as a police commissioner and as trustee of the police pension fund, in that he neglected and failed to make an examination of the records and accounts of the superintendent of police and the books and accounts of the treasurer of the city, to learn and ascertain if all moneys which properly should be deposited to the credit of the police pension fund were so deposited, and failed to learn and ascertain that the sum of $12,284.11, which had been collected by the superintendent of police upon the sale of dog tags and the issuing of pistol permits was wrongfully withheld by said superintendent and was not deposited to the credit of the police pension fund, and failed and neglected to cause the same to be paid to the credit of the said fund, as the same should have been in accordance with the provisions of the charter and ordinances.

The facts set forth in charges 1 and 2, that as a member of the board of police Commissioner Doherty did not pay over or cause to be paid over the sum mentioned so received by the superintendent, and that he neglected and failed to make an examination of the records and accounts

of the superintendent, and the books and accounts of the treasurer, to learn and ascertain the shortage in the accounts of Superintendent Bull, and failed and neglected to cause the same to be paid to the credit of the police pension fund, are undisputed. The only difference, as suggested by counsel for the applicant, between the two charges, first and second, is that in the first Mr. Doherty is charged with failure to turn over the moneys received during his term of office to the city treasurer, as provided by section 211 of the charter, while in the second he is charged with neglect of duty in not examining the books and accounts of the superintendent and treasurer, to learn and ascertain if all moneys which properly belonged to and should be credited to the police pension fund were so deposited and credited, not only during his term of office, but during the entire term of Superintendent Bull.

Section 211 provides that the moneys received belonging to the police pension fund, which includes all rewards or gifts to any member of the police force not allowed to be retained, moneys arising from the sale of unclaimed goods, fines imposed upon the members of the police force, and all fees received under the two preceding sections, being fees for pistol permits and dog licenses, shall be paid monthly by the board and deposited with the treasurer of the city. It would be impracticable for the board (the mayor and police commissioners) to personally receive and deposit these moneys, and, in view of the provisions of the two preceding sections, this provision of section 211 is to be regarded as making the police board responsible only for the general supervision of the payment of these moneys to and the deposit of the same with the city treasurer. Sections 209 and 210 expressly provide that the superintendent of police shall receive and deposit the fees for pistol permits and dog licenses with the treasurer of the city.

The remaining question to be considered is whether the failure of the respondent personally to examine the records and accounts of the superintendent of police and the books and accounts of the city treasurer, to learn and ascertain if all the moneys which properly should have been deposited to the credit of the police pension fund were so deposited, is such neglect of his official duties as require the removal of Commissioner Doherty from office. While we do not agree with the learned referee in his recommendation that the application of the mayor for removal should be granted, we have been greatly aided in our consideration of the case by his able and exhaustive report. The referee very properly certifies that Commissioner Doherty is free from any intent to do wrong. The information that the fees for dog licenses and pistol permits had not been deposited with the city treasurer came to him as a surprise.

It is urged that the statements of City Treasurer Shepard furnished Mr. Doherty with information that no money for these fees had been deposited during the period covered by the first two years of his term. The testimony of the city treasurer, who had the books before him and made the reports, is significant, not only as to the fact of Commissioner Doherty's lack of information, but also as to his ability to acquire it from the city treasurer's reports. Mr. Shepard testified that he attended a meeting of the board of trustees of the police pension fund on December 6, 1905, the next day after addressing a letter to Mr.

Doherty, as Secretary of the Board, calling attention to the fact that the fund had not received anything from licenses or permits since April 30, 1904, to December, 1905. His testimony follows:

"The next day I went to police headquarters to attend a meeting of the police pension fund. One of the commissioners, I think Mr. Doherty, had a letter in his hand, and I said: 'Why, I wrote you yesterday.' He said: 'Yes, we are just reading it.' My recollection is that he said: 'This is a surprise to us. We will have the matter looked up at once.' Q. Mr. Shepard, that was a surprise, you say, to them. When did you find for the first time that nothing had been paid into the fund since April 30, 1904, from those sources? A. I don't recall having my attention directed to that specific thing until this date."

It appears that at the instance of the mayor examinations of the police pension fund were made from time to time by expert accountants and reported to the common council, and that each of these reports showed an examination of the police pension fund in detail, and found to be correct and intact. During Mr. Doherty's term such examinations were made in November, 1903, February and November, 1904, and April and December, 1905. It was not until the last of December, 1905, when the expert accountant appointed by Mayor Knight investigated this fund from the beginning of the term of Superintendent Bull, that the actual condition of the police pension fund, showing the shortage in his accounts, was discovered. In his communication of April 19, 1905, to the board of trustees of the police pension fund, the city treasurer states:

"I beg to call your attention to the report of Joseph C. Adams, expert examiner, dated April 15th, submitted to the board of aldermen by his honor, the mayor, under date of April 17th, and covering transactions in the city treasurer's office from October 11, 1904, to March 20, 1905. This states that all entries of receipts and disbursements were checked and found correct. The condition of the police pension fund at the commencement of business on March 20, 1905, was as follows: Balance, $151,533.37—appended to which are the items of the account making up the amount."

While this communication did not state that the expert accountant had verified the several sources from which the account of the pension fund was made up, it was fair to assume that it had been done. It is claimed by counsel for the respondent that the reports of the expert examiners of the police pension fund, made from time to time at the instance of the mayor, presumably were correct and truly stated the condition of the fund, and that the police board had the right to rely upon them; that the board, as stated by Mr. Rupp in his testimony giving his belief, believed that the experts had gone over the entire pension fund— as he said: "I naturally should think that that is what an expert examiner was for." We think this contention of respondent's counsel is correct. There are no provisions of the charter defining the duties of the members of the police board as trustees in the matter of the preservation of the police pension fund. It is not among the duties enjoined upon the police commissioners enumerated in the charter. They are made ex officio trustees of the fund, and act in all matters relating thereto as a board. They were not required to make individual examinations of the accounts, either of the superintendent of police or the city treasurer. It could not be said that if expert accountants were employed by the police board, and the accounts of the fund were on such

examinations found to be intact, that they had not performed their whole duty. The same, we think, must be said of the examinations made by the expert accountants at the instance of the mayor. The examinations were made as much for the information of the officials of the city having to do with the fund as for the common council. Commissioner Doherty could not, under the circumstances, be regarded derelict in duty, unless the shortage in the deposit of the fees collected by Superintendent Bull actually came to his knowledge, which, clearly, upon the evidence, it must be regarded that it did not.

The case, we think, might be disposed of upon this ground, but we think it may be also upon the further ground that the failure of Commissioner Doherty to personally examine the accounts of the dog licenses and pistol permits is not such neglect of his official duties as require his removal from office. We are referred to the rules of law governing trustees generally in the preservation of funds intrusted to them, which require personal supervision, and the exercise of such care and prudence in the management of the trust estate as men of common prudence ordinarily exercise in their own affairs. This, we think, is not the rule applicable to an examination into the official conduct of the respondent in respect to the preservation of this fund. The true rule to be applied in determining whether there has been such a violation of official duty by Commissioner Doherty as require removal from office is found in the case of People ex rel. Munday v. Fire Commissioners, 72 N. Y. 445, in which the removal of a clerk in the fire department for cause was authorized. It was held that the provision necessarily implies that "cause" must be some dereliction or general neglect of duty, or some delinquency affecting the general character of the one sought to be removed, and his fitness for the office. In People v. Diehl, 53 App. Div. 645, 65 N. Y Supp. 801, the language of the Munday Case is quoted with unanimous approval by this court.

In determining whether the respondent was intentionally remiss in the performance of his duties as a member of the board of trustees of the police pension fund, the circumstances under which he took office may be considered, as also the reliance he would naturally place in his colleagues. Mr. Doherty had never before held public office. Mr. Rupp had been a police commissioner since 1894. Mr. Knight had been the comptroller of the city for six years, Comptroller of the state of New York, and mayor of the city. Superintendent Bull had been at the head of the police force since 1894. He had the entire confidence, not only of Mayor Knight and Commissioner Rupp, but of the whole community. Mr. Shepard, the city treasurer, and Mr. Boeckel before him, both pension fund trustees, were men of integrity, careful and painstaking in the performance of their official duties. In the performance of his duties Mr. Doherty would naturally rely upon his colleagues of many years' experience as public officials. He knew that the superintendent had been collecting and depositing these moneys, and had the right to expect that the city treasurer would notify him and the other trustees of any failure of the superintendent to deposit the moneys to the credit of the pension fund. Mr. Doherty is not shown to have been guilty of any general neglect of his official duties, or of any wrongdoing, nothing which in any manner indicates that he is an inefficient

or generally negligent police commissioner, or that he has not the capacity or fitness to properly perform the duties of that office. We think that his removal from office for an unintentional neglect of one of his many duties cannot be regarded as within the letter or spirit of the statute.

Motion to confirm the report of the referee denied, and proceedings dismissed. The applicant should be required to pay the referee's fees and stenographer's bill, as adjusted by this court. All concur.

---

## FANIZZI v. NEW YORK & Q. C. R. CO.

(Supreme Court, Appellate Division, Second Department. June 8, 1906.)

**1. CARRIERS—STREET RAILROADS—INJURIES TO PASSENGERS—NEGLIGENCE.**

A passenger on a street car who was smoking struck a match, and then threw it away while lighted, so that it ignited the frock of a female passenger, which blazed and caused a panic in the car, because of which plaintiff either was thrown, pushed, or jumped from the car and was injured. The motorman then stopped the car and acted promptly in the emergency in extinguishing the fire. *Held*, that such facts were insufficient to establish negligence on the part of the railway company.

**2. SAME—PROXIMATE CAUSE.**

The fact that the passenger was permitted to smoke on the front seat of the car, in violation of a rule of the company, was not the proximate cause of the injury.

**3. NEGLIGENCE—PROXIMATE CAUSE—QUESTION FOR COURT.**

Where there is no dispute as to the facts, the question of the proximate cause of an injury is for the court.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Negligence, § 292.]

Appeal from Queens County Court.