(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MARYLAND *v.* KING

### CERTIORARI TO THE COURT OF APPEALS OF MARYLAND

No. 12–207. Argued February 26, 2013—Decided June 3, 2013

After his 2009 arrest on first- and second-degree assault charges, respondent King was processed through a Wicomico County, Maryland, facility, where booking personnel used a cheek swab to take a DNA sample pursuant to the Maryland DNA Collection Act (Act). The swab was matched to an unsolved 2003 rape, and King was charged with that crime. He moved to suppress the DNA match, arguing that the Act violated the Fourth Amendment, but the Circuit Court Judge found the law constitutional. King was convicted of rape. The Maryland Court of Appeals set aside the conviction, finding unconstitutional the portions of the Act authorizing DNA collection from felony arrestees.

*Held*: When officers make an arrest supported by probable cause to hold for a serious offense and bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment. Pp. 3–28.

(a) DNA testing may "significantly improve both the criminal justice system and police investigative practices," *District Attorney's Office for Third Judicial Dist.* v. *Osborne*, 557 U. S. 52, 55, by making it "possible to determine whether a biological tissue matches a suspect with near certainty," *id.,* at 62. Maryland's Act authorizes law enforcement authorities to collect DNA samples from, as relevant here, persons charged with violent crimes, including first-degree assault. A sample may not be added to a database before an individual is arraigned, and it must be destroyed if, *e.g.,* he is not convicted. Only identity information may be added to the database. Here, the officer collected a DNA sample using the common "buccal swab" procedure, which is quick and painless, requires no "surgical intrusio[n] beneath

the skin," *Winston* v. *Lee*, 470 U. S. 753, 760, and poses no threat to the arrestee's "health or safety," *id.,* at 763. Respondent's identification as the rapist resulted in part through the operation of the Combined DNA Index System (CODIS), which connects DNA laboratories at the local, state, and national level, and which standardizes the points of comparison, *i.e.,* loci, used in DNA analysis. Pp. 3–7.

(b) The framework for deciding the issue presented is well established. Using a buccal swab inside a person's cheek to obtain a DNA sample is a search under the Fourth Amendment. And the fact that the intrusion is negligible is of central relevance to determining whether the search is reasonable, "the ultimate measure of the constitutionality of a governmental search," *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 652. Because the need for a warrant is greatly diminished here, where the arrestee was already in valid police custody for a serious offense supported by probable cause, the search is analyzed by reference to "reasonableness, not individualized suspicion," *Samson* v. *California*, 547 U. S. 843, 855, n. 4, and reasonableness is determined by weighing "the promotion of legitimate governmental interests" against "the degree to which [the search] intrudes upon an individual's privacy," *Wyoming* v. *Houghton*, 526 U. S. 295, 300. Pp. 7–10.

(c) In this balance of reasonableness, great weight is given to both the significant government interest at stake in the identification of arrestees and DNA identification's unmatched potential to serve that interest. Pp. 10–23.

(1) The Act serves a well-established, legitimate government interest: the need of law enforcement officers in a safe and accurate way to process and identify persons and possessions taken into custody. "[P]robable cause provides legal justification for arresting a [suspect], and for a brief period of detention to take the administrative steps incident to arrest," *Gerstein* v. *Pugh*, 420 U. S. 103, 113–114; and the "validity of the search of a person incident to a lawful arrest" is settled, *United States* v. *Robinson*, 414 U. S. 218, 224. Individual suspicion is not necessary. The "routine administrative procedure[s] at a police station house incident to booking and jailing the suspect" have different origins and different constitutional justifications than, say, the search of a place not incident to arrest, *Illinois* v. *Lafayette*, 462 U. S. 640, 643, which depends on the "fair probability that contraband or evidence of a crime will be found in a particular place," *Illinois* v. *Gates*, 462 U. S. 213, 238. And when probable cause exists to remove an individual from the normal channels of society and hold him in legal custody, DNA identification plays a critical role in serving those interests. First, the government has an interest in properly identifying "who has been arrested and who is being tried."

Syllabus

*Hiibel* v. *Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U. S. 177, 191. Criminal history is critical to officers who are processing a suspect for detention. They already seek identity information through routine and accepted means: comparing booking photographs to sketch artists' depictions, showing mugshots to potential witnesses, and comparing fingerprints against electronic databases of known criminals and unsolved crimes. The only difference between DNA analysis and fingerprint databases is the unparalleled accuracy DNA provides. DNA is another metric of identification used to connect the arrestee with his or her public persona, as reflected in records of his or her actions that are available to the police. Second, officers must ensure that the custody of an arrestee does not create inordinate "risks for facility staff, for the existing detainee population, and for a new detainee." *Florence* v. *Board of Chosen Freeholders of County of Burlington*, 566 U. S. ___, ___. DNA allows officers to know the type of person being detained. Third, "the Government has a substantial interest in ensuring that persons accused of crimes are available for trials." *Bell* v. *Wolfish*, 441 U. S. 520, 534. An arrestee may be more inclined to flee if he thinks that continued contact with the criminal justice system may expose another serious offense. Fourth, an arrestee's past conduct is essential to assessing the danger he poses to the public, which will inform a court's bail determination. Knowing that the defendant is wanted for a previous violent crime based on DNA identification may be especially probative in this regard. Finally, in the interests of justice, identifying an arrestee as the perpetrator of some heinous crime may have the salutary effect of freeing a person wrongfully imprisoned. Pp. 10–18.

(2) DNA identification is an important advance in the techniques long used by law enforcement to serve legitimate police concerns. Police routinely have used scientific advancements as standard procedures for identifying arrestees. Fingerprinting, perhaps the most direct historical analogue to DNA technology, has, from its advent, been viewed as a natural part of "the administrative steps incident to arrest." *County of Riverside* v. *McLaughlin*, 500 U. S. 44, 58. However, DNA identification is far superior. The additional intrusion upon the arrestee's privacy beyond that associated with fingerprinting is not significant, and DNA identification is markedly more accurate. It may not be as fast as fingerprinting, but rapid fingerprint analysis is itself of recent vintage, and the question of how long it takes to process identifying information goes to the efficacy of the search for its purpose of prompt identification, not the constitutionality of the search. Rapid technical advances are also reducing DNA processing times. Pp. 18–23.

(d) The government interest is not outweighed by respondent's pri-

vacy interests. Pp. 23–28.

(1) By comparison to the substantial government interest and the unique effectiveness of DNA identification, the intrusion of a cheek swab to obtain a DNA sample is minimal. Reasonableness must be considered in the context of an individual's legitimate privacy expectations, which necessarily diminish when he is taken into police custody. *Bell, supra,* at 557. Such searches thus differ from the so-called special needs searches of, *e.g.,* otherwise law-abiding motorists at checkpoints. See *Indianapolis* v. *Edmond*, 531 U. S. 32. The reasonableness inquiry considers two other circumstances in which particularized suspicion is not categorically required: "diminished expectations of privacy [and a] minimal intrusion." *Illinois* v. *McArthur*, 531 U. S. 326, 330. An invasive surgery may raise privacy concerns weighty enough for the search to require a warrant, notwithstanding the arrestee's diminished privacy expectations, but a buccal swab, which involves a brief and minimal intrusion with "virtually no risk, trauma, or pain," *Schmerber* v. *California*, 384 U. S. 757, 771, does not increase the indignity already attendant to normal incidents of arrest. Pp. 23–26.

(2) The processing of respondent's DNA sample's CODIS loci also did not intrude on his privacy in a way that would make his DNA identification unconstitutional. Those loci came from noncoding DNA parts that do not reveal an arrestee's genetic traits and are unlikely to reveal any private medical information. Even if they could provide such information, they are not in fact tested for that end. Finally, the Act provides statutory protections to guard against such invasions of privacy. Pp. 26–28.

425 Md. 550, 42 A. 3d 549, reversed.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, BREYER, and ALITO, JJ., joined. SCALIA, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–207

MARYLAND, PETITIONER *v.* ALONZO JAY KING, JR.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF MARYLAND

[June 3, 2013]

JUSTICE KENNEDY delivered the opinion of the Court.

In 2003 a man concealing his face and armed with a gun broke into a woman's home in Salisbury, Maryland. He raped her. The police were unable to identify or apprehend the assailant based on any detailed description or other evidence they then had, but they did obtain from the victim a sample of the perpetrator's DNA.

In 2009 Alonzo King was arrested in Wicomico County, Maryland, and charged with first- and second-degree assault for menacing a group of people with a shotgun. As part of a routine booking procedure for serious offenses, his DNA sample was taken by applying a cotton swab or filter paper—known as a buccal swab—to the inside of his cheeks. The DNA was found to match the DNA taken from the Salisbury rape victim. King was tried and convicted for the rape. Additional DNA samples were taken from him and used in the rape trial, but there seems to be no doubt that it was the DNA from the cheek sample taken at the time he was booked in 2009 that led to his first having been linked to the rape and charged with its commission.

The Court of Appeals of Maryland, on review of King's

rape conviction, ruled that the DNA taken when King was booked for the 2009 charge was an unlawful seizure because obtaining and using the cheek swab was an unreasonable search of the person. It set the rape conviction aside. This Court granted certiorari and now reverses the judgment of the Maryland court.

I

When King was arrested on April 10, 2009, for menacing a group of people with a shotgun and charged in state court with both first- and second-degree assault, he was processed for detention in custody at the Wicomico County Central Booking facility. Booking personnel used a cheek swab to take the DNA sample from him pursuant to provisions of the Maryland DNA Collection Act (or Act).

On July 13, 2009, King's DNA record was uploaded to the Maryland DNA database, and three weeks later, on August 4, 2009, his DNA profile was matched to the DNA sample collected in the unsolved 2003 rape case. Once the DNA was matched to King, detectives presented the forensic evidence to a grand jury, which indicted him for the rape. Detectives obtained a search warrant and took a second sample of DNA from King, which again matched the evidence from the rape. He moved to suppress the DNA match on the grounds that Maryland's DNA collection law violated the Fourth Amendment. The Circuit Court Judge upheld the statute as constitutional. King pleaded not guilty to the rape charges but was convicted and sentenced to life in prison without the possibility of parole.

In a divided opinion, the Maryland Court of Appeals struck down the portions of the Act authorizing collection of DNA from felony arrestees as unconstitutional. The majority concluded that a DNA swab was an unreasonable search in violation of the Fourth Amendment because King's "expectation of privacy is greater than the State's

purported interest in using King's DNA to identify him."
425 Md. 550, 561, 42 A. 3d 549, 556 (2012).  In reach-
ing that conclusion the Maryland Court relied on the deci-
sions of various other courts that have concluded that
DNA identification of arrestees is impermissible.  See, *e.g.,
People* v. *Buza*, 129 Cal. Rptr. 3d 753 (App. 2011) (offi-
cially depublished); *Mario W.* v. *Kaipio*, 228 Ariz. 207,
265 P. 3d 389 (App. 2011).

Both federal and state courts have reached differing
conclusions as to whether the Fourth Amendment prohib-
its the collection and analysis of a DNA sample from
persons arrested, but not yet convicted, on felony charges.
This Court granted certiorari, 568 U. S. ___ (2012), to
address the question.  King is the respondent here.

## II

The advent of DNA technology is one of the most signifi-
cant scientific advancements of our era.  The full potential
for use of genetic markers in medicine and science is still
being explored, but the utility of DNA identification in the
criminal justice system is already undisputed.  Since the
first use of forensic DNA analysis to catch a rapist and
murderer in England in 1986, see J. Butler, Fundamentals
of Forensic DNA Typing 5 (2009) (hereinafter Butler), law
enforcement, the defense bar, and the courts have
acknowledged DNA testing's "unparalleled ability both to
exonerate the wrongly convicted and to identify the guilty.
It has the potential to significantly improve both the
criminal justice system and police investigative practices."
*District Attorney's Office for Third Judicial Dist.* v. *Os-
borne*, 557 U. S. 52, 55 (2009).

## A

The current standard for forensic DNA testing relies on
an analysis of the chromosomes located within the nucleus
of all human cells.  "The DNA material in chromosomes is

composed of 'coding' and 'noncoding' regions. The coding regions are known as *genes* and contain the information necessary for a cell to make proteins. . . . Non-protein-coding regions . . . are not related directly to making proteins, [and] have been referred to as 'junk' DNA." Butler 25. The adjective "junk" may mislead the layperson, for in fact this is the DNA region used with near certainty to identify a person. The term apparently is intended to indicate that this particular noncoding region, while useful and even dispositive for purposes like identity, does not show more far-reaching and complex characteristics like genetic traits.

Many of the patterns found in DNA are shared among all people, so forensic analysis focuses on "repeated DNA sequences scattered throughout the human genome," known as "short tandem repeats" (STRs). *Id.*, at 147–148. The alternative possibilities for the size and frequency of these STRs at any given point along a strand of DNA are known as "alleles," *id.*, at 25; and multiple alleles are analyzed in order to ensure that a DNA profile matches only one individual. Future refinements may improve present technology, but even now STR analysis makes it "possible to determine whether a biological tissue matches a suspect with near certainty." *Osborne, supra*, at 62.

The Act authorizes Maryland law enforcement authorities to collect DNA samples from "an individual who is charged with . . . a crime of violence or an attempt to commit a crime of violence; or . . . burglary or an attempt to commit burglary." Md. Pub. Saf. Code Ann. §2–504(a)(3)(i) (Lexis 2011). Maryland law defines a crime of violence to include murder, rape, first-degree assault, kidnaping, arson, sexual assault, and a variety of other serious crimes. Md. Crim. Law Code Ann. §14–101 (Lexis 2012). Once taken, a DNA sample may not be processed or placed in a database before the individual is arraigned (unless the individual consents). Md. Pub. Saf. Code Ann.

§2–504(d)(1) (Lexis 2011). It is at this point that a judicial officer ensures that there is probable cause to detain the arrestee on a qualifying serious offense. If "all qualifying criminal charges are determined to be unsupported by probable cause . . . the DNA sample shall be immediately destroyed." §2–504(d)(2)(i). DNA samples are also destroyed if "a criminal action begun against the individual . . . does not result in a conviction," "the conviction is finally reversed or vacated and no new trial is permitted," or "the individual is granted an unconditional pardon." §2–511(a)(1).

The Act also limits the information added to a DNA database and how it may be used. Specifically, "[o]nly DNA records that directly relate to the identification of individuals shall be collected and stored." §2–505(b)(1). No purpose other than identification is permissible: "A person may not willfully test a DNA sample for information that does not relate to the identification of individuals as specified in this subtitle." §2–512(c). Tests for familial matches are also prohibited. See §2–506(d) ("A person may not perform a search of the statewide DNA data base for the purpose of identification of an offender in connection with a crime for which the offender may be a biological relative of the individual from whom the DNA sample was acquired"). The officers involved in taking and analyzing respondent's DNA sample complied with the Act in all respects.

Respondent's DNA was collected in this case using a common procedure known as a "buccal swab." "Buccal cell collection involves wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells." Butler 86. The procedure is quick and painless. The swab touches inside an arrestee's mouth, but it requires no "surgical intrusio[n] beneath the skin," *Winston* v. *Lee*, 470 U. S. 753, 760 (1985), and it poses no "threa[t] to the health or

safety" of arrestees, *id.,* at 763.

## B

Respondent's identification as the rapist resulted in part through the operation of a national project to standardize collection and storage of DNA profiles. Authorized by Congress and supervised by the Federal Bureau of Investigation, the Combined DNA Index System (CODIS) connects DNA laboratories at the local, state, and national level. Since its authorization in 1994, the CODIS system has grown to include all 50 States and a number of federal agencies. CODIS collects DNA profiles provided by local laboratories taken from arrestees, convicted offenders, and forensic evidence found at crime scenes. To participate in CODIS, a local laboratory must sign a memorandum of understanding agreeing to adhere to quality standards and submit to audits to evaluate compliance with the federal standards for scientifically rigorous DNA testing. Butler 270.

One of the most significant aspects of CODIS is the standardization of the points of comparison in DNA analysis. The CODIS database is based on 13 loci at which the STR alleles are noted and compared. These loci make possible extreme accuracy in matching individual samples, with a "random match probability of approximately 1 in 100 trillion (assuming unrelated individuals)." *Ibid.* The CODIS loci are from the non-protein coding junk regions of DNA, and "are not known to have any association with a genetic disease or any other genetic predisposition. Thus, the information in the database is only useful for human identity testing." *Id.,* at 279. STR information is recorded only as a "string of numbers"; and the DNA identification is accompanied only by information denoting the laboratory and the analyst responsible for the submission. *Id.,* at 270. In short, CODIS sets uniform national standards for DNA matching and then facilitates connec-

tions between local law enforcement agencies who can share more specific information about matched STR profiles.

All 50 States require the collection of DNA from felony convicts, and respondent does not dispute the validity of that practice. See Brief for Respondent 48. Twenty-eight States and the Federal Government have adopted laws similar to the Maryland Act authorizing the collection of DNA from some or all arrestees. See Brief for State of California et al. as *Amici Curiae* 4, n. 1 (States Brief) (collecting state statutes). Although those statutes vary in their particulars, such as what charges require a DNA sample, their similarity means that this case implicates more than the specific Maryland law. At issue is a standard, expanding technology already in widespread use throughout the Nation.

## III
### A

Although the DNA swab procedure used here presents a question the Court has not yet addressed, the framework for deciding the issue is well established. The Fourth Amendment, binding on the States by the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." It can be agreed that using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search. Virtually any "intrusio[n] into the human body," *Schmerber* v. *California*, 384 U. S. 757, 770 (1966), will work an invasion of "'cherished personal security' that is subject to constitutional scrutiny," *Cupp* v. *Murphy*, 412 U. S. 291, 295 (1973) (quoting *Terry* v. *Ohio*, 392 U. S. 1, 24–25 (1968)). The Court has applied the Fourth Amendment to police efforts to draw blood, see *Schmerber*, *supra*; *Missouri* v. *McNeely*, 569 U. S. \_\_\_

(2013), scraping an arrestee's fingernails to obtain trace evidence, see *Cupp, supra,* and even to "a breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis," *Skinner* v. *Railway Labor Executives' Assn.,* 489 U. S. 602, 616 (1989).

A buccal swab is a far more gentle process than a venipuncture to draw blood. It involves but a light touch on the inside of the cheek; and although it can be deemed a search within the body of the arrestee, it requires no "surgical intrusions beneath the skin." *Winston,* 470 U. S., at 760. The fact than an intrusion is negligible is of central relevance to determining reasonableness, although it is still a search as the law defines that term.

## B

To say that the Fourth Amendment applies here is the beginning point, not the end of the analysis. "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Schmerber, supra,* at 768. "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Vernonia School Dist. 47J* v. *Acton,* 515 U. S. 646, 652 (1995). In giving content to the inquiry whether an intrusion is reasonable, the Court has preferred "some quantum of individualized suspicion . . . [as] a prerequisite to a constitutional search or seizure. But the Fourth Amendment imposes no irreducible requirement of such suspicion." *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 560–561 (1976) (citation and footnote omitted).

In some circumstances, such as "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has

found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *Illinois* v. *McArthur*, 531 U. S. 326, 330 (2001). Those circumstances diminish the need for a warrant, either because "the public interest is such that neither a warrant nor probable cause is required," *Maryland* v. *Buie*, 494 U. S. 325, 331 (1990), or because an individual is already on notice, for instance because of his employment, see *Skinner*, *supra*, or the conditions of his release from government custody, see *Samson* v. *California*, 547 U. S. 843 (2006), that some reasonable police intrusion on his privacy is to be expected. The need for a warrant is perhaps least when the search involves no discretion that could properly be limited by the "interpo[lation of] a neutral magistrate between the citizen and the law enforcement officer." *Treasury Employees* v. *Von Raab*, 489 U. S. 656, 667 (1989).

The instant case can be addressed with this background. The Maryland DNA Collection Act provides that, in order to obtain a DNA sample, all arrestees charged with serious crimes must furnish the sample on a buccal swab applied, as noted, to the inside of the cheeks. The arrestee is already in valid police custody for a serious offense supported by probable cause. The DNA collection is not subject to the judgment of officers whose perspective might be "colored by their primary involvement in 'the often competitive enterprise of ferreting out crime.'" *Terry*, *supra*, at 12 (quoting *Johnson* v. *United States*, 333 U. S. 10, 14 (1948)). As noted by this Court in a different but still instructive context involving blood testing, "[b]oth the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically in the regulations that authorize them . . . . Indeed, in light of the standardized nature of the tests and the minimal discretion vested in those charged with administering the program, there are virtu-

ally no facts for a neutral magistrate to evaluate." *Skinner*, *supra*, at 622. Here, the search effected by the buccal swab of respondent falls within the category of cases this Court has analyzed by reference to the proposition that the "touchstone of the Fourth Amendment is reasonableness, not individualized suspicion." *Samson*, *supra*, at 855, n. 4.

Even if a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for it must be reasonable in its scope and manner of execution. Urgent government interests are not a license for indiscriminate police behavior. To say that no warrant is required is merely to acknowledge that "rather than employing a *per se* rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *McArthur*, *supra*, at 331. This application of "traditional standards of reasonableness" requires a court to weigh "the promotion of legitimate governmental interests" against "the degree to which [the search] intrudes upon an individual's privacy." *Wyoming* v. *Houghton*, 526 U. S. 295, 300 (1999). An assessment of reasonableness to determine the lawfulness of requiring this class of arrestees to provide a DNA sample is central to the instant case.

## IV
### A

The legitimate government interest served by the Maryland DNA Collection Act is one that is well established: the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody. It is beyond dispute that "probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest." *Gerstein* v. *Pugh*, 420 U. S. 103, 113–114 (1975).

Also uncontested is the "right on the part of the Government, always recognized under English and American law, to search the person of the accused when legally arrested." *Weeks* v. *United States*, 232 U. S. 383, 392 (1914), over-ruled on other grounds, *Mapp* v. *Ohio*, 367 U. S. 643 (1961). "The validity of the search of a person incident to a lawful arrest has been regarded as settled from its first enunciation, and has remained virtually unchallenged." *United States* v. *Robinson*, 414 U. S. 218, 224 (1973). Even in that context, the Court has been clear that individual suspicion is not necessary, because "[t]he constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence. The fact of a lawful arrest, standing alone, authorizes a search." *Michigan* v. *DeFillippo*, 443 U. S. 31, 35 (1979).

The "routine administrative procedure[s] at a police station house incident to booking and jailing the suspect" derive from different origins and have different constitutional justifications than, say, the search of a place, *Illinois* v. *Lafayette*, 462 U. S. 640, 643 (1983); for the search of a place not incident to an arrest depends on the "fair probability that contraband or evidence of a crime will be found in a particular place," *Illinois* v. *Gates*, 462 U. S. 213, 238 (1983). The interests are further different when an individual is formally processed into police custody. Then "the law is in the act of subjecting the body of the accused to its physical dominion." *People* v. *Chiagles*, 237 N. Y. 193, 197, 142 N. E. 583, 584 (1923) (Cardozo, J.). When probable cause exists to remove an individual from the normal channels of society and hold him in legal custody, DNA identification plays a critical role in serving those interests.

First, "[i]n every criminal case, it is known and must be known who has been arrested and who is being tried." *Hiibel* v. *Sixth Judicial Dist. Court of Nev., Humboldt*

*Cty.*, 542 U. S. 177, 191 (2004). An individual's identity is more than just his name or Social Security number, and the government's interest in identification goes beyond ensuring that the proper name is typed on the indictment. Identity has never been considered limited to the name on the arrestee's birth certificate. In fact, a name is of little value compared to the real interest in identification at stake when an individual is brought into custody. "It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features." *Jones* v. *Murray*, 962 F. 2d 302, 307 (CA4 1992). An "arrestee may be carrying a false ID or lie about his identity," and "criminal history records . . . can be inaccurate or incomplete." *Florence* v. *Board of Chosen Freeholders of County of Burlington*, 566 U. S. ___, ___ (2012) (slip op., at 16).

A suspect's criminal history is a critical part of his identity that officers should know when processing him for detention. It is a common occurrence that "[p]eople detained for minor offenses can turn out to be the most devious and dangerous criminals. Hours after the Oklahoma City bombing, Timothy McVeigh was stopped by a state trooper who noticed he was driving without a license plate. Police stopped serial killer Joel Rifkin for the same reason. One of the terrorists involved in the September 11 attacks was stopped and ticketed for speeding just two days before hijacking Flight 93." *Id.,* at ___ (slip op., at 14) (citations omitted). Police already seek this crucial identifying information. They use routine and accepted means as varied as comparing the suspect's booking photograph to sketch artists' depictions of persons of interest, showing his mugshot to potential witnesses, and of course making a computerized comparison of the arrestee's fin-

gerprints against electronic databases of known criminals and unsolved crimes. In this respect the only difference between DNA analysis and the accepted use of fingerprint databases is the unparalleled accuracy DNA provides.

The task of identification necessarily entails searching public and police records based on the identifying information provided by the arrestee to see what is already known about him. The DNA collected from arrestees is an irrefutable identification of the person from whom it was taken. Like a fingerprint, the 13 CODIS loci are not themselves evidence of any particular crime, in the way that a drug test can by itself be evidence of illegal narcotics use. A DNA profile is useful to the police because it gives them a form of identification to search the records already in their valid possession. In this respect the use of DNA for identification is no different than matching an arrestee's face to a wanted poster of a previously unidentified suspect; or matching tattoos to known gang symbols to reveal a criminal affiliation; or matching the arrestee's fingerprints to those recovered from a crime scene. See Tr. of Oral Arg. 19. DNA is another metric of identification used to connect the arrestee with his or her public persona, as reflected in records of his or her actions that are available to the police. Those records may be linked to the arrestee by a variety of relevant forms of identification, including name, alias, date and time of previous convictions and the name then used, photograph, Social Security number, or CODIS profile. These data, found in official records, are checked as a routine matter to produce a more comprehensive record of the suspect's complete identity. Finding occurrences of the arrestee's CODIS profile in outstanding cases is consistent with this common practice. It uses a different form of identification than a name or fingerprint, but its function is the same.

Second, law enforcement officers bear a responsibility for ensuring that the custody of an arrestee does not cre-

ate inordinate "risks for facility staff, for the existing detainee population, and for a new detainee." *Florence*, *supra*, at ___ (slip op., at 10). DNA identification can provide untainted information to those charged with detaining suspects and detaining the property of any felon. For these purposes officers must know the type of person whom they are detaining, and DNA allows them to make critical choices about how to proceed.

> "Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere. Identity may prove particularly important in [certain cases, such as] where the police are investigating what appears to be a domestic assault. Officers called to investigate domestic disputes need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Hiibel*, *supra*, at 186.

Recognizing that a name alone cannot address this interest in identity, the Court has approved, for example, "a visual inspection for certain tattoos and other signs of gang affiliation as part of the intake process," because "[t]he identification and isolation of gang members before they are admitted protects everyone." *Florence, supra,* at ___ (slip op., at 11).

Third, looking forward to future stages of criminal prosecution, "the Government has a substantial interest in ensuring that persons accused of crimes are available for trials." *Bell* v. *Wolfish*, 441 U. S. 520, 534 (1979). A person who is arrested for one offense but knows that he has yet to answer for some past crime may be more inclined to flee the instant charges, lest continued contact with the criminal justice system expose one or more other serious

offenses. For example, a defendant who had committed a prior sexual assault might be inclined to flee on a burglary charge, knowing that in every State a DNA sample would be taken from him after his conviction on the burglary charge that would tie him to the more serious charge of rape. In addition to subverting the administration of justice with respect to the crime of arrest, this ties back to the interest in safety; for a detainee who absconds from custody presents a risk to law enforcement officers, other detainees, victims of previous crimes, witnesses, and society at large.

Fourth, an arrestee's past conduct is essential to an assessment of the danger he poses to the public, and this will inform a court's determination whether the individual should be released on bail. "The government's interest in preventing crime by arrestees is both legitimate and compelling." *United States* v. *Salerno*, 481 U. S. 739, 749 (1987). DNA identification of a suspect in a violent crime provides critical information to the police and judicial officials in making a determination of the arrestee's future dangerousness. This inquiry always has entailed some scrutiny beyond the name on the defendant's driver's license. For example, Maryland law requires a judge to take into account not only "the nature and circumstances of the offense charged" but also "the defendant's family ties, employment status and history, financial resources, reputation, character and mental condition, length of residence in the community." 1 Md. Rules 4–216(f)(1)(A), (C) (2013). Knowing that the defendant is wanted for a previous violent crime based on DNA identification is especially probative of the court's consideration of "the danger of the defendant to the alleged victim, another person, or the community." Rule 4–216(f)(1)(G); see also 18 U. S. C. §3142 (2006 ed. and Supp. V) (similar requirements).

This interest is not speculative. In considering laws to

require collecting DNA from arrestees, government agencies around the Nation found evidence of numerous cases in which felony arrestees would have been identified as violent through DNA identification matching them to previous crimes but who later committed additional crimes because such identification was not used to detain them. See Denver's Study on Preventable Crimes (2009) (three examples), online at http://www.denverda.org/DNA_ Documents / Denver%27s%20Preventable%20Crimes%20 Study.pdf (all Internet materials as visited May 31, 2013, and available in Clerk of Court's case file); Chicago's Study on Preventable Crimes (2005) (five examples), online at http://www.denverda.org/DNA_Documents/ Arrestee_Database / Chicago%20Preventable%20Crimes-Final.pdf; Maryland Study on Preventable Crimes (2008) (three examples), online at http://www.denverda.org/DNA_ Documents/MarylandDNAarresteestudy.pdf.

Present capabilities make it possible to complete a DNA identification that provides information essential to determining whether a detained suspect can be released pending trial. See, *e.g.,* States Brief 18, n. 10 ("DNA identification database samples have been processed in as few as two days in California, although around 30 days has been average"). Regardless of when the initial bail decision is made, release is not appropriate until a further determination is made as to the person's identity in the sense not only of what his birth certificate states but also what other records and data disclose to give that identity more meaning in the whole context of who the person really is. And even when release is permitted, the background identity of the suspect is necessary for determining what conditions must be met before release is allowed. If release is authorized, it may take time for the conditions to be met, and so the time before actual release can be substantial. For example, in the federal system, defendants released conditionally are detained on average for

112 days; those released on unsecured bond for 37 days; on personal recognizance for 36 days; and on other financial conditions for 27 days. See Dept. of Justice, Bureau of Justice Statistics, Compendium of Federal Justice Statistics 45 (NCJ–213476, Dec. 2006) online at http://bjs.gov/content/pub/pdf/cfjs04.pdf. During this entire period, additional and supplemental data establishing more about the person's identity and background can provide critical information relevant to the conditions of release and whether to revisit an initial release determination. The facts of this case are illustrative. Though the record is not clear, if some thought were being given to releasing the respondent on bail on the gun charge, a release that would take weeks or months in any event, when the DNA report linked him to the prior rape, it would be relevant to the conditions of his release. The same would be true with a supplemental fingerprint report.

Even if an arrestee is released on bail, development of DNA identification revealing the defendant's unknown violent past can and should lead to the revocation of his conditional release. See 18 U. S. C. §3145(a) (providing for revocation of release); see also States Brief 11–12 (discussing examples where bail and diversion determinations were reversed after DNA identified the arrestee's violent history). Pretrial release of a person charged with a dangerous crime is a most serious responsibility. It is reasonable in all respects for the State to use an accepted database to determine if an arrestee is the object of suspicion in other serious crimes, suspicion that may provide a strong incentive for the arrestee to escape and flee.

Finally, in the interests of justice, the identification of an arrestee as the perpetrator of some heinous crime may have the salutary effect of freeing a person wrongfully imprisoned for the same offense. "[P]rompt [DNA] testing . . . would speed up apprehension of criminals before they commit additional crimes, and prevent the grotesque

detention of . . . innocent people." J. Dwyer, P. Neufeld, & B. Scheck, Actual Innocence 245 (2000).

Because proper processing of arrestees is so important and has consequences for every stage of the criminal process, the Court has recognized that the "governmental interests underlying a station-house search of the arrestee's person and possessions may in some circumstances be even greater than those supporting a search immediately following arrest." *Lafayette*, 462 U. S., at 645. Thus, the Court has been reluctant to circumscribe the authority of the police to conduct reasonable booking searches. For example, "[t]he standards traditionally governing a search incident to lawful arrest are not . . . commuted to the stricter *Terry* standards." *Robinson*, 414 U. S., at 234. Nor are these interests in identification served only by a search of the arrestee himself. "[I]nspection of an arrestee's personal property may assist the police in ascertaining or verifying his identity." *Lafayette*, *supra*, at 646. And though the Fifth Amendment's protection against self-incrimination is not, as a general rule, governed by a reasonableness standard, the Court has held that "questions . . . reasonably related to the police's administrative concerns . . . fall outside the protections of *Miranda* [v. *Arizona*, 384 U. S. 436 (1966)] and the answers thereto need not be suppressed." *Pennsylvania* v. *Muniz*, 496 U. S. 582, 601–602 (1990).

B

DNA identification represents an important advance in the techniques used by law enforcement to serve legitimate police concerns for as long as there have been arrests, concerns the courts have acknowledged and approved for more than a century. Law enforcement agencies routinely have used scientific advancements in their standard procedures for the identification of arrestees. "Police had been using photography to capture

the faces of criminals almost since its invention." S. Cole, Suspect Identities 20 (2001). Courts did not dispute that practice, concluding that a "sheriff in making an arrest for a felony on a warrant has the right to exercise a discretion . . . , [if] he should deem it necessary to the safe-keeping of a prisoner, and to prevent his escape, or to enable him the more readily to retake the prisoner if he should escape, to take his photograph." *State ex rel. Bruns* v. *Clausmier*, 154 Ind. 599, 601, 603, 57 N. E. 541, 542 (1900). By the time that it had become "the daily practice of the police officers and detectives of crime to use photographic pictures for the discovery and identification of criminals," the courts likewise had come to the conclusion that "it would be [a] matter of regret to have its use unduly restricted upon any fanciful theory or constitutional privilege." *Shaffer* v. *United States*, 24 App. D. C. 417, 426 (1904).

Beginning in 1887, some police adopted more exacting means to identify arrestees, using the system of precise physical measurements pioneered by the French anthropologist Alphonse Bertillon. Bertillon identification consisted of 10 measurements of the arrestee's body, along with a "scientific analysis of the features of the face and an exact anatomical localization of the various scars, marks, &c., of the body." Defense of the Bertillon System, N. Y. Times, Jan. 20, 1896, p. 3. "[W]hen a prisoner was brought in, his photograph was taken according to the Bertillon system, and his body measurements were then made. The measurements were made . . . and noted down on the back of a card or a blotter, and the photograph of the prisoner was expected to be placed on the card. This card, therefore, furnished both the likeness and description of the prisoner, and was placed in the rogues' gallery, and copies were sent to various cities where similar records were kept." *People ex rel. Jones* v. *Diehl*, 53 App. Div. 645, 646, 65 N. Y. S. 801, 802 (1900). As in the present case, the point of taking this information about each ar-

restee was not limited to verifying that the proper name was on the indictment. These procedures were used to "facilitate the recapture of escaped prisoners," to aid "the investigation of their past records and personal history," and "to preserve the means of identification for . . . future supervision after discharge." *Hodgeman* v. *Olsen*, 86 Wash. 615, 619, 150 P. 1122, 1124 (1915); see also *McGovern* v. *Van Riper*, 137 N. J. Eq. 24, 33–34, 43 A. 2d 514, 519 (Ch. 1945) ("[C]riminal identification is said to have two main purposes: (1) The identification of the accused as the person who committed the crime for which he is being held; and, (2) the identification of the accused as the same person who has been previously charged with, or convicted of, other offenses against the criminal law").

Perhaps the most direct historical analogue to the DNA technology used to identify respondent is the familiar practice of fingerprinting arrestees. From the advent of this technique, courts had no trouble determining that fingerprinting was a natural part of "the administrative steps incident to arrest." *County of Riverside* v. *McLaughlin*, 500 U. S. 44, 58 (1991). In the seminal case of *United States* v. *Kelly*, 55 F. 2d 67 (CA2 1932), Judge Augustus Hand wrote that routine fingerprinting did not violate the Fourth Amendment precisely because it fit within the accepted means of processing an arrestee into custody:

> "Finger printing seems to be no more than an extension of methods of identification long used in dealing with persons under arrest for real or supposed violations of the criminal laws. It is known to be a very certain means devised by modern science to reach the desired end, and has become especially important in a time when increased population and vast aggregations of people in urban centers have rendered the notoriety of the individual in the community no longer a ready means of identification.

.          .          .          .          .

> "We find no ground in reason or authority for inter-
> fering with a method of identifying persons charged
> with crime which has now become widely known and
> frequently practiced." *Id.*, at 69–70.

By the middle of the 20th century, it was considered "ele-
mentary that a person in lawful custody may be required
to submit to photographing and fingerprinting as part of
routine identification processes." *Smith* v. *United States*,
324 F. 2d 879, 882 (CADC 1963) (Burger, J.) (citations
omitted).

DNA identification is an advanced technique superior to
fingerprinting in many ways, so much so that to insist on
fingerprints as the norm would make little sense to either
the forensic expert or a layperson. The additional intru-
sion upon the arrestee's privacy beyond that associated
with fingerprinting is not significant, see Part V, *infra*,
and DNA is a markedly more accurate form of identifying
arrestees. A suspect who has changed his facial features
to evade photographic identification or even one who has
undertaken the more arduous task of altering his finger-
prints cannot escape the revealing power of his DNA.

The respondent's primary objection to this analogy is
that DNA identification is not as fast as fingerprinting,
and so it should not be considered to be the 21st-century
equivalent. See Tr. of Oral Arg. 53. But rapid analysis of
fingerprints is itself of recent vintage. The FBI's vaunted
Integrated Automated Fingerprint Identification System
(IAFIS) was only "launched on July 28, 1999. Prior to this
time, the processing of . . . fingerprint submissions was
largely a manual, labor-intensive process, taking weeks or
months to process a single submission." Federal Bureau of
Investigation, Integrated Automated Fingerprint Identifi-
cation System, online at http://www.fbi.gov/about-us/cjis/
fingerprints_biometrics/iafis/iafis. It was not the advent of

this technology that rendered fingerprint analysis constitutional in a single moment. The question of how long it takes to process identifying information obtained from a valid search goes only to the efficacy of the search for its purpose of prompt identification, not the constitutionality of the search. Cf. *Ontario* v. *Quon*, 560 U. S. ___, ___ (2010) (slip op., at 15). Given the importance of DNA in the identification of police records pertaining to arrestees and the need to refine and confirm that identity for its important bearing on the decision to continue release on bail or to impose of new conditions, DNA serves an essential purpose despite the existence of delays such as the one that occurred in this case. Even so, the delay in processing DNA from arrestees is being reduced to a substantial degree by rapid technical advances. See, *e.g.,* Attorney General DeWine Announces Significant Drop in DNA Turnaround Time (Jan. 4, 2013) (DNA processing time reduced from 125 days in 2010 to 20 days in 2012), online at http://ohioattorneygeneral.gov/Media/News-Releases/January-2013/Attorney-General-DeWine-Announces-Significant-Drop; Gov. Jindal Announces Elimination of DNA Backlog, DNA Unit Now Operating in Real Time (Nov. 17, 2011) (average DNA report time reduced from a year or more in 2009 to 20 days in 2011), online at http://www.gov.state.la.us/index.cfm?md=newsroom&tmp=detail&articleID=3102. And the FBI has already begun testing devices that will enable police to process the DNA of arrestees within 90 minutes. See Brief for National District Attorneys Association as *Amicus Curiae* 20–21; Tr. of Oral Arg. 17. An assessment and understanding of the reasonableness of this minimally invasive search of a person detained for a serious crime should take account of these technical advances. Just as fingerprinting was constitutional for generations prior to the introduction of IAFIS, DNA identification of arrestees is a permissible tool of law enforcement today. New technology will only further

improve its speed and therefore its effectiveness. And, as noted above, actual release of a serious offender as a routine matter takes weeks or months in any event. By identifying not only who the arrestee is but also what other available records disclose about his past to show who he is, the police can ensure that they have the proper person under arrest and that they have made the necessary arrangements for his custody; and, just as important, they can also prevent suspicion against or prosecution of the innocent.

In sum, there can be little reason to question "the legitimate interest of the government in knowing for an absolute certainty the identity of the person arrested, in knowing whether he is wanted elsewhere, and in ensuring his identification in the event he flees prosecution." 3 W. LaFave, Search and Seizure §5.3(c), p. 216 (5th ed. 2012). To that end, courts have confirmed that the Fourth Amendment allows police to take certain routine "administrative steps incident to arrest—*i.e.,* . . . book[ing], photograph[ing], and fingerprint[ing]." *McLaughlin*, 500 U. S*.,* at 58. DNA identification of arrestees, of the type approved by the Maryland statute here at issue, is "no more than an extension of methods of identification long used in dealing with persons under arrest." *Kelly*, 55 F. 2d, at 69. In the balance of reasonableness required by the Fourth Amendment, therefore, the Court must give great weight both to the significant government interest at stake in the identification of arrestees and to the unmatched potential of DNA identification to serve that interest.

## V
### A

By comparison to this substantial government interest and the unique effectiveness of DNA identification, the intrusion of a cheek swab to obtain a DNA sample is a

minimal one.  True, a significant government interest does
not alone suffice to justify a search.  The government
interest must outweigh the degree to which the search in-
vades an individual's legitimate expectations of privacy.
In considering those expectations in this case, however,
the necessary predicate of a valid arrest for a serious
offense is fundamental.  "Although the underlying com-
mand of the Fourth Amendment is always that searches
and seizures be reasonable, what is reasonable depends on
the context within which a search takes place."  *New
Jersey* v. *T. L. O.,* 469 U. S. 325, 337 (1985).  "[T]he legiti-
macy of certain privacy expectations vis-à-vis the State
may depend upon the individual's legal relationship with
the State."  *Vernonia School Dist. 47J*, 515 U. S., at 654.

The reasonableness of any search must be considered
in the context of the person's legitimate expectations of
privacy.  For example, when weighing the invasiveness of
urinalysis of high school athletes, the Court noted that
"[l]egitimate privacy expectations are even less with re-
gard to student athletes. . . . Public school locker rooms,
the usual sites for these activities, are not notable for the
privacy they afford."  *Id.*, at 657.  Likewise, the Court
has used a context-specific benchmark inapplicable to the
public at large when "the expectations of privacy of cov-
ered employees are diminished by reason of their participa-
tion in an industry that is regulated pervasively," *Skinner*,
489 U. S., at 627, or when "the 'operational realities of
the workplace' may render entirely reasonable certain
work-related intrusions by supervisors and co-workers
that might be viewed as unreasonable in other contexts,"
*Von Raab*, 489 U. S., at 671.

The expectations of privacy of an individual taken into
police custody "necessarily [are] of a diminished scope."
*Bell,* 441 U. S., at 557.  "[B]oth the person and the property
in his immediate possession may be searched at the
station house."  *United States* v. *Edwards*, 415 U. S. 800,

803 (1974). A search of the detainee's person when he is booked into custody may "'involve a relatively extensive exploration,'" *Robinson*, 414 U. S., at 227, including "requir[ing] at least some detainees to lift their genitals or cough in a squatting position," *Florence*, 566 U. S., at \_\_\_ (slip op., at 13).

In this critical respect, the search here at issue differs from the sort of programmatic searches of either the public at large or a particular class of regulated but otherwise law-abiding citizens that the Court has previously labeled as "'special needs'" searches. *Chandler* v. *Miller*, 520 U. S. 305, 314 (1997). When the police stop a motorist at a checkpoint, see *Indianapolis* v. *Edmond*, 531 U. S. 32 (2000), or test a political candidate for illegal narcotics, see *Chandler, supra*, they intrude upon substantial expectations of privacy. So the Court has insisted on some purpose other than "to detect evidence of ordinary criminal wrongdoing" to justify these searches in the absence of individualized suspicion. *Edmond, supra,* at 38. Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, however, his or her expectations of privacy and freedom from police scrutiny are reduced. DNA identification like that at issue here thus does not require consideration of any unique needs that would be required to justify searching the average citizen. The special needs cases, though in full accord with the result reached here, do not have a direct bearing on the issues presented in this case, because unlike the search of a citizen who has not been suspected of a wrong, a detainee has a reduced expectation of privacy.

The reasonableness inquiry here considers two other circumstances in which the Court has held that particularized suspicion is not categorically required: "diminished expectations of privacy [and] minimal intrusions." *McArthur*, 531 U. S., at 330. This is not to suggest that any

search is acceptable solely because a person is in custody. Some searches, such as invasive surgery, see *Winston*, 470 U. S. 753, or a search of the arrestee's home, see *Chimel* v. *California*, 395 U. S. 752 (1969), involve either greater intrusions or higher expectations of privacy than are present in this case. In those situations, when the Court must "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable," *McArthur*, *supra*, at 331, the privacy-related concerns are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee.

Here, by contrast to the approved standard procedures incident to any arrest detailed above, a buccal swab involves an even more brief and still minimal intrusion. A gentle rub along the inside of the cheek does not break the skin, and it "involves virtually no risk, trauma, or pain." *Schmerber*, 384 U. S., at 771. "A crucial factor in analyzing the magnitude of the intrusion . . . is the extent to which the procedure may threaten the safety or health of the individual," *Winston*, *supra*, at 761, and nothing suggests that a buccal swab poses any physical danger whatsoever. A brief intrusion of an arrestee's person is subject to the Fourth Amendment, but a swab of this nature does not increase the indignity already attendant to normal incidents of arrest.

B

In addition the processing of respondent's DNA sample's 13 CODIS loci did not intrude on respondent's privacy in a way that would make his DNA identification unconstitutional.

First, as already noted, the CODIS loci come from noncoding parts of the DNA that do not reveal the genetic traits of the arrestee. While science can always progress further, and those progressions may have Fourth Amend-

ment consequences, alleles at the CODIS loci "are not at present revealing information beyond identification." Katsanis & Wagner, Characterization of the Standard and Recommended CODIS Markers*,* 58 J. Forensic Sci. S169, S171 (2013). The argument that the testing at issue in this case reveals any private medical information at all is open to dispute.

And even if non-coding alleles could provide some information, they are not in fact tested for that end. It is undisputed that law enforcement officers analyze DNA for the sole purpose of generating a unique identifying number against which future samples may be matched. This parallels a similar safeguard based on actual practice in the school drug-testing context, where the Court deemed it "significant that the tests at issue here look only for drugs, and not for whether the student is, for example, epileptic, pregnant, or diabetic." *Vernonia School Dist. 47J*, 515 U. S., at 658. If in the future police analyze samples to determine, for instance, an arrestee's predisposition for a particular disease or other hereditary factors not relevant to identity, that case would present additional privacy concerns not present here.

Finally, the Act provides statutory protections that guard against further invasion of privacy. As noted above, the Act requires that "[o]nly DNA records that directly relate to the identification of individuals shall be collected and stored." Md. Pub. Saf. Code Ann. §2–505(b)(1). No purpose other than identification is permissible: "A person may not willfully test a DNA sample for information that does not relate to the identification of individuals as specified in this subtitle." §2–512(c). This Court has noted often that "a 'statutory or regulatory duty to avoid unwarranted disclosures' generally allays . . . privacy concerns." *NASA* v. *Nelson*, 562 U. S. ___, ___ (2011) (slip op., at 20) (quoting *Whalen* v. *Roe*, 429 U. S. 589, 605 (1977)). The Court need not speculate about the risks posed "by a

system that did not contain comparable security provi-
sions." *Id.,* at 606. In light of the scientific and statutory
safeguards, once respondent's DNA was lawfully collected
the STR analysis of respondent's DNA pursuant to CODIS
procedures did not amount to a significant invasion of
privacy that would render the DNA identification imper-
missible under the Fourth Amendment.

*         *         *

In light of the context of a valid arrest supported by
probable cause respondent's expectations of privacy were
not offended by the minor intrusion of a brief swab of his
cheeks. By contrast, that same context of arrest gives rise
to significant state interests in identifying respondent not
only so that the proper name can be attached to his charges
but also so that the criminal justice system can make
informed decisions concerning pretrial custody. Upon
these considerations the Court concludes that DNA identi-
fication of arrestees is a reasonable search that can be
considered part of a routine booking procedure. When
officers make an arrest supported by probable cause to
hold for a serious offense and they bring the suspect to the
station to be detained in custody, taking and analyzing a
cheek swab of the arrestee's DNA is, like fingerprinting
and photographing, a legitimate police booking procedure
that is reasonable under the Fourth Amendment.

The judgment of the Court of Appeals of Maryland is
reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–207

_____

## MARYLAND, PETITIONER *v.* ALONZO JAY KING, JR.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
MARYLAND

[June 3, 2013]

JUSTICE SCALIA, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

The Fourth Amendment forbids searching a person for evidence of a crime when there is no basis for believing the person is guilty of the crime or is in possession of incriminating evidence. That prohibition is categorical and without exception; it lies at the very heart of the Fourth Amendment. Whenever this Court has allowed a suspicionless search, it has insisted upon a justifying motive apart from the investigation of crime.

It is obvious that no such noninvestigative motive exists in this case. The Court's assertion that DNA is being taken, not to solve crimes, but to *identify* those in the State's custody, taxes the credulity of the credulous. And the Court's comparison of Maryland's DNA searches to other techniques, such as fingerprinting, can seem apt only to those who know no more than today's opinion has chosen to tell them about how those DNA searches actually work.

### I
#### A

At the time of the Founding, Americans despised the British use of so-called "general warrants"—warrants not grounded upon a sworn oath of a specific infraction by a particular individual, and thus not limited in scope and

application. The first Virginia Constitution declared that "general warrants, whereby any officer or messenger may be commanded to search suspected places without evidence of a fact committed," or to search a person "whose offence is not particularly described and supported by evidence," "are grievous and oppressive, and ought not be granted." Va. Declaration of Rights §10 (1776), in 1 B. Schwartz, The Bill of Rights: A Documentary History 234, 235 (1971). The Maryland Declaration of Rights similarly provided that general warrants were "illegal." Md. Declaration of Rights §XXIII (1776), in *id.,* at 280, 282.

In the ratification debates, Antifederalists sarcastically predicted that the general, suspicionless warrant would be among the Constitution's "blessings." Blessings of the New Government, Independent Gazetteer, Oct. 6, 1787, in 13 Documentary History of the Ratification of the Constitution 345 (J. Kaminski & G. Saladino eds. 1981). "Brutus" of New York asked why the Federal Constitution contained no provision like Maryland's, Brutus II, N. Y. Journal, Nov. 1, 1787, in *id.,* at 524, and Patrick Henry warned that the new Federal Constitution would expose the citizenry to searches and seizures "in the most arbitrary manner, without any evidence or reason." 3 Debates on the Federal Constitution 588 (J. Elliot 2d ed. 1854).

Madison's draft of what became the Fourth Amendment answered these charges by providing that the "rights of the people to be secured in their persons . . . from all unreasonable searches and seizures, shall not be violated by warrants issued without probable cause . . . or not particularly describing the places to be searched." 1 Annals of Cong. 434–435 (1789). As ratified, the Fourth Amendment's Warrant Clause forbids a warrant to "issue" except "upon probable cause," and requires that it be "particula[r]" (which is to say, *individualized*) to "the place to be searched, and the persons or things to be seized." And we have held that, even when a warrant is not constitution-

ally necessary, the Fourth Amendment's general prohibition of "unreasonable" searches imports the same requirement of individualized suspicion. See *Chandler* v. *Miller*, 520 U. S. 305, 308 (1997).

Although there is a "closely guarded category of constitutionally permissible suspicionless searches," *id.,* at 309, that has never included searches designed to serve "the normal need for law enforcement," *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 619 (1989) (internal quotation marks omitted). Even the common name for suspicionless searches—"special needs" searches—itself reflects that they must be justified, *always*, by concerns "other than crime detection." *Chandler, supra,* at 313–314. We have approved random drug tests of railroad employees, yes—but only because the Government's need to "regulat[e] the conduct of railroad employees to ensure safety" is distinct from "normal law enforcement." *Skinner, supra,* at 620. So too we have approved suspicionless searches in public schools—but only because there the government acts in furtherance of its "responsibilities . . . as guardian and tutor of children entrusted to its care." *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 665 (1995).

So while the Court is correct to note (*ante,* at 8–9) that there are instances in which we have permitted searches without individualized suspicion, "[i]n none of these cases . . . did we indicate approval of a [search] whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Indianapolis* v. *Edmond*, 531 U. S. 32, 38 (2000). That limitation is crucial. It is only when a governmental purpose aside from crime-solving is at stake that we engage in the free-form "reasonableness" inquiry that the Court indulges at length today. To put it another way, both the legitimacy of the Court's method and the correctness of its outcome hinge entirely on the truth of a single proposition: that the primary purpose of these DNA

searches is something other than simply discovering evidence of criminal wrongdoing.  As I detail below, that proposition is wrong.

B

The Court alludes at several points (see *ante,* at 11, 25) to the fact that King was an arrestee, and arrestees may be validly searched incident to their arrest.  But the Court does not really *rest* on this principle, and for good reason: The objects of a search incident to arrest must be either (1) weapons or evidence that might easily be destroyed, or (2) evidence relevant to the crime of arrest.  See *Arizona* v. *Gant*, 556 U. S. 332, 343–344 (2009); *Thornton* v. *United States*, 541 U. S. 615, 632 (2004) (SCALIA, J., concurring in judgment).  Neither is the object of the search at issue here.

The Court hastens to clarify that it does not mean to approve invasive surgery on arrestees or warrantless searches of their homes.  *Ante,* at 25.  That the Court feels the need to disclaim these consequences is as damning a criticism of its suspicionless-search regime as any I can muster.  And the Court's attempt to distinguish those hypothetical searches from this real one is unconvincing. We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." *Ante,* at 26.  But why are the "privacy-related concerns" not also "weighty" when an intrusion into the *body* is at stake?  (The Fourth Amendment lists "persons" *first* among the entities protected against unreasonable searches and seizures.)  And could the police engage, without any suspicion of wrongdoing, in a "brief and . . . minimal" intrusion into the home of an arrestee—perhaps just peeking around the curtilage a bit?  See *ante,* at 26.  Obviously not.

At any rate, all this discussion is beside the point.  No

matter the degree of invasiveness, suspicionless searches are *never* allowed if their principal end is ordinary crime-solving. A search incident to arrest either serves other ends (such as officer safety, in a search for weapons) or is not suspicionless (as when there is reason to believe the arrestee possesses evidence relevant to the crime of arrest).

Sensing (correctly) that it needs more, the Court elaborates at length the ways that the search here served the special purpose of "identifying" King.[1] But that seems to me quite wrong—unless what one means by "identifying" someone is "searching for evidence that he has committed crimes unrelated to the crime of his arrest." At points the Court does appear to use "identifying" in that peculiar sense—claiming, for example, that knowing "an arrestee's past conduct is essential to an assessment of the danger he poses." *Ante,* at 15. If identifying someone means finding out what unsolved crimes he has committed, then identification is indistinguishable from the ordinary law-enforcement aims that have never been thought to justify a suspicionless search. Searching every lawfully stopped car, for example, might turn up information about unsolved crimes the driver had committed, but no one would say that such a search was aimed at "identifying" him, and

---

[1] The Court's insistence (*ante,* at 25) that our special-needs cases "do not have a direct bearing on the issues presented in this case" is perplexing. Why spill so much ink on the special need of identification if a special need is not required? Why not just come out and say that any suspicionless search of an arrestee is allowed if it will be useful to solve crimes? The Court does not say that because most Members of the Court do not believe it. So whatever the Court's major premise—the opinion does not really contain what you would call a rule of decision—the *minor* premise is "this search was used to identify King." The incorrectness of that minor premise will therefore suffice to demonstrate the error in the Court's result.

no court would hold such a search lawful. I will therefore assume that the Court means that the DNA search at issue here was useful to "identify" King in the normal sense of that word—in the sense that would identify the author of Introduction to the Principles of Morals and Legislation as Jeremy Bentham.

1

The portion of the Court's opinion that explains the identification rationale is strangely silent on the actual workings of the DNA search at issue here. To know those facts is to be instantly disabused of the notion that what happened had anything to do with identifying King.

King was arrested on April 10, 2009, on charges unrelated to the case before us. That same day, April 10, the police searched him and seized the DNA evidence at issue here. What happened next? Reading the Court's opinion, particularly its insistence that the search was necessary to know "who [had] been arrested," *ante,* at 11, one might guess that King's DNA was swiftly processed and his identity thereby confirmed—perhaps against some master database of known DNA profiles, as is done for fingerprints. After all, was not the suspicionless search here crucial to avoid "inordinate risks for facility staff" or to "existing detainee population," *ante,* at 14? Surely, then—*surely*—the State of Maryland got cracking on those grave risks immediately, by rushing to identify King with his DNA as soon as possible.

Nothing could be further from the truth. Maryland officials did not even begin the process of testing King's DNA that day. Or, actually, the next day. Or the day after that. And that was for a simple reason: Maryland law forbids them to do so. A "DNA sample collected from an individual charged with a crime . . . *may not* be tested or placed in the statewide DNA data base system prior to the first scheduled arraignment date." Md. Pub. Saf. Code

Ann. §2–504(d)(1) (Lexis 2011) (emphasis added). And
King's first appearance in court was not until three days
after his arrest. (I suspect, though, that they did not wait
three days to ask his name or take his fingerprints.)

This places in a rather different light the Court's solemn
declaration that the search here was necessary so that
King could be identified at "every stage of the criminal
process." *Ante,* at 18. I hope that the Maryland officials
who read the Court's opinion do not take it seriously.
Acting on the Court's misperception of Maryland law could
lead to jail time. See Md. Pub. Saf. Code Ann. §2–512(c)–(e)
(punishing by up to five years' imprisonment anyone who
obtains or tests DNA information except as provided by
statute). Does the Court really believe that Maryland
did not know whom it was arraigning? The Court's re-
sponse is to imagine that release on bail could take so long
that the DNA results are returned in time, or perhaps that
bail could be revoked if the DNA test turned up incrimi-
nating information. *Ante,* at 16–17. That is no answer at
all. If the purpose of this Act is to assess "whether [King]
should be released on bail," *ante,* at 15, why would it
*possibly* forbid the DNA testing process to *begin* until King
was arraigned? Why would Maryland resign itself to
simply hoping that the bail decision will drag out long
enough that the "identification" can succeed before the
arrestee is released? The truth, known to Maryland and
increasingly to the reader: this search had nothing to do
with establishing King's identity.

It gets worse. King's DNA sample was not received by
the Maryland State Police's Forensic Sciences Division
until April 23, 2009—two weeks after his arrest. It sat in
that office, ripening in a storage area, until the custodians
got around to mailing it to a lab for testing on June 25,
2009—two months after it was received, and nearly *three*
since King's arrest. After it was mailed, the data from the
lab tests were not available for several more weeks, until

July 13, 2009, which is when the test results were entered into Maryland's DNA database, *together with information identifying the person from whom the sample was taken.* Meanwhile, bail had been set, King had engaged in discovery, and he had requested a speedy trial—presumably not a trial of John Doe. It was not until August 4, 2009— four months after King's arrest—that the forwarded sample transmitted (*without* identifying information) from the Maryland DNA database to the Federal Bureau of Investigation's national database was matched with a sample taken from the scene of an unrelated crime years earlier.

A more specific description of exactly what happened at this point illustrates why, by definition, King could not have been *identified* by this match. The FBI's DNA database (known as CODIS) consists of two distinct collections. FBI, CODIS and NDIS Fact Sheet, http:// www.fbi.gov/about-us/lab/codis/codis-and-ndis-fact-sheet (all Internet materials as visited May 31, 2013, and available in Clerk of Court's case file). One of them, the one to which King's DNA was submitted, consists of DNA samples taken from known convicts or arrestees. I will refer to this as the "Convict and Arrestee Collection." The other collection consists of samples taken from crime scenes; I will refer to this as the "Unsolved Crimes Collection." The Convict and Arrestee Collection stores "no names or other personal identifiers of the offenders, arrestees, or detainees." *Ibid.* Rather, it contains only the DNA profile itself, the name of the agency that submitted it, the laboratory personnel who analyzed it, and an identification number for the specimen. *Ibid.* This is because the submitting state laboratories are expected *already* to know the identities of the convicts and arrestees from whom samples are taken. (And, of course, they do.)

Moreover, the CODIS system works by checking to see whether any of the samples in the Unsolved Crimes Collection match any of the samples in the Convict and Ar-

restee Collection. *Ibid.* That is sensible, if what one wants to do is solve those cold cases, but note what it requires: that the identity of the people whose DNA has been entered in the Convict and Arrestee Collection *already be known.*[2] If one wanted to identify someone in custody using his DNA, the logical thing to do would be to compare that DNA against the Convict and Arrestee Collection: to search, in other words, the collection that could be used (by checking back with the submitting state agency) to identify people, rather than the collection of evidence from unsolved crimes, whose perpetrators are by definition unknown. But that is not what was done. And that is because this search had nothing to do with identification.

In fact, if anything was "identified" at the moment that the DNA database returned a match, it was not King—his identity was already known. (The docket for the original criminal charges lists his full name, his race, his sex, his height, his weight, his date of birth, and his address.) Rather, what the August 4 match "identified" was *the previously-taken sample from the earlier crime.* That sample was genuinely mysterious to Maryland; the State knew that it had probably been left by the victim's attacker, but nothing else. King was not identified by his association with the sample; rather, the sample was identified by its association with King. The Court effectively destroys its own "identification" theory when it acknowledges that the object of this search was "to see what [was] already known about [King]." King was who he was, and

———————

[2] By the way, this procedure has nothing to do with exonerating the wrongfully convicted, as the Court soothingly promises. See *ante,* at 17. The FBI CODIS database includes DNA from *unsolved* crimes. I know of no indication (and the Court cites none) that it also includes DNA from all—or even any—crimes whose perpetrators have already been convicted.

volumes of his biography could not make him any more or any less King. No minimally competent speaker of English would say, upon noticing a known arrestee's similarity "to a wanted poster of a previously unidentified suspect," *ante,* at 13, that the *arrestee* had thereby been identified. It was the previously unidentified suspect who had been identified—just as, here, it was the previously unidentified rapist.

2

That taking DNA samples from arrestees has nothing to do with identifying them is confirmed not just by actual practice (which the Court ignores) but by the enabling statute itself (which the Court also ignores). The Maryland Act at issue has a section helpfully entitled "Purpose of collecting and testing DNA samples." Md. Pub. Saf. Code Ann. §2–505. (One would expect such a section to play a somewhat larger role in the Court's analysis of the Act's purpose—which is to say, at least *some* role.) That provision lists five purposes for which DNA samples may be tested. By this point, it will not surprise the reader to learn that the Court's imagined purpose is not among them.

Instead, the law provides that DNA samples are collected and tested, as a matter of Maryland law, "as part of an official investigation into a crime." §2–505(a)(2). (Or, as our suspicionless-search cases would put it: for ordinary law-enforcement purposes.) That is certainly how everyone has always understood the Maryland Act until today. The Governor of Maryland, in commenting on our decision to hear this case, said that he was glad, because "[a]llowing law enforcement to collect DNA samples . . . is absolutely critical to our efforts to continue driving down crime," and "bolsters our efforts to resolve open investigations and bring them to a resolution." Marbella, Supreme Court Will Review Md. DNA Law, Baltimore Sun, Nov. 10,

2012, pp. 1, 14. The attorney general of Maryland remarked that he "look[ed] forward to the opportunity to defend this important crime-fighting tool," and praised the DNA database for helping to "bring to justice violent perpetrators." *Ibid.* Even this Court's order staying the decision below states that the statute "provides a valuable tool for investigating unsolved crimes and thereby helping to remove violent offenders from the general population"— with, unsurprisingly, no mention of identity. 567 U. S. ___, ___ (2012) (ROBERTS, C. J., in chambers) (slip op., at 3).

More devastating still for the Court's "identification" theory, the statute *does* enumerate two instances in which a DNA sample may be tested for the purpose of identification: "to help identify *human remains*," §2–505(a)(3) (emphasis added), and "to help identify *missing individuals*," §2–505(a)(4) (emphasis added). No mention of identifying arrestees. *Inclusio unius est exclusio alterius.* And note again that Maryland forbids using DNA records "for any purposes other than those specified"—it is actually a crime to do so. §2–505(b)(2).

The Maryland regulations implementing the Act confirm what is now monotonously obvious: These DNA searches have nothing to do with identification. For example, if someone is arrested and law enforcement determines that "a convicted offender Statewide DNA Data Base sample already exists" for that arrestee, "the agency is not required to obtain a new sample." Code of Md. Regs., tit. 29, §05.01.04(B)(4) (2011). But how could the State know if an arrestee has already had his DNA sample collected, if the point of the sample is to identify who he is? Of course, if the DNA sample is instead taken in order to investigate crimes, this restriction makes perfect sense: Having previously placed an identified someone's DNA on file to check against available crime-scene evidence, there is no sense in going to the expense of taking a new sample.

Maryland's regulations further require that the "individual collecting a sample . . . verify the identity of the individual from whom a sample is taken by name and, if applicable, State identification (SID) number." §05.01.04(K). (But how?) And after the sample is taken, it continues to be identified *by* the individual's name, fingerprints, etc., see §05.01.07(B)—rather than (as the Court believes) being used *to identify* individuals. See §05.01.07(B)(2) ("Records and specimen information shall *be identified by* . . . [the] [n]ame of the donor" (emphasis added)).

So, to review: DNA testing does not even begin until after arraignment and bail decisions are already made. The samples sit in storage for months, and take weeks to test. When they are tested, they are checked against the Unsolved Crimes Collection—rather than the Convict and Arrestee Collection, which could be used to identify them. The Act forbids the Court's purpose (identification), but prescribes as its purpose what our suspicionless-search cases forbid ("official investigation into a crime"). Against all of that, it is safe to say that if the Court's identification theory is not wrong, there is no such thing as error.

## II

The Court also attempts to bolster its identification theory with a series of inapposite analogies. See *ante,* at 18–23.

Is not taking DNA samples the same, asks the Court, as taking a person's photograph? No—because that is not a Fourth Amendment search at all. It does not involve a physical intrusion onto the person, see *Florida* v. *Jardines*, 569 U. S. 1, ___ (2013) (slip op., at 3), and we have never held that merely taking a person's photograph invades any recognized "expectation of privacy," see *Katz* v. *United States*, 389 U. S. 347 (1967). Thus, it is unsurprising that the cases the Court cites as authorizing photo-

taking do not even mention the Fourth Amendment. See *State ex rel. Bruns* v. *Clausmier*, 154 Ind. 599, 57 N. E. 541 (1900) (libel), *Shaffer* v. *United States*, 24 App. D. C. 417 (1904) (Fifth Amendment privilege against self-incrimination).

But is not the practice of DNA searches, the Court asks, the same as taking "Bertillon" measurements—noting an arrestee's height, shoe size, and so on, on the back of a photograph? No, because that system was not, in the ordinary case, used to solve unsolved crimes. It is possible, I suppose, to imagine situations in which such measurements might be useful to generate leads. (If witnesses described a very tall burglar, all the "tall man" cards could then be pulled.) But the obvious primary purpose of such measurements, as the Court's description of them makes clear, was to verify that, for example, the person arrested today is the same person that was arrested a year ago. Which is to say, Bertillon measurements were *actually* used as a system of identification, and drew their primary usefulness from that task.[3]

It is on the fingerprinting of arrestees, however, that the Court relies most heavily. *Ante,* at 20–23. The Court does not actually say whether it believes that taking a person's fingerprints is a Fourth Amendment search, and our cases provide no ready answer to that question. Even assuming so, however, law enforcement's post-arrest use of fingerprints could not be more different from its post-arrest use of DNA. Fingerprints of arrestees are taken primarily to identify them (though that process sometimes solves

---

[3] Puzzlingly, the Court's discussion of photography and Bertillon measurements repeatedly cites state cases (such as *Clausmier*) that were decided before the Fourth Amendment was held to be applicable to the States. See *Wolf* v. *Colorado*, 338 U. S. 25 (1949); *Mapp* v. *Ohio*, 367 U. S. 643 (1961). Why the Court believes them relevant to the meaning of that Amendment is therefore something of a mystery.

crimes); the DNA of arrestees is taken to solve crimes (and nothing else). Contrast CODIS, the FBI's nationwide DNA database, with IAFIS, the FBI's Integrated Automated Fingerprint Identification System. See FBI, Integrated Automated Fingerprint Identification System, http://www.fbi.gov/about-us/cjis/fingerprints_biometrics/iafis/iafis (hereinafter *IAFIS*).

| Fingerprints | DNA Samples |
|---|---|
| The "average response time for an electronic criminal fingerprint submission is about 27 minutes." *IAFIS*. | DNA analysis can take months—far too long to be useful for identifying someone. |
| IAFIS includes detailed identification information, including "criminal histo-ries; mug shots; scars and tattoo photos; physical characteristics like height, weight, and hair and eye color." | CODIS contains "[n]o names or other personal identifiers of the offenders, arrestees, or detainees." See CODIS and NDIS Fact Sheet. |
| "Latent prints" recovered from crime scenes are not systematically compared against the database of known fingerprints, since that requires further forensic work.[4] | The entire *point* of the DNA database is to check crime scene evidence against the profiles of arrestees and convicts as they come in. |

---

[4] See, *e.g.,* FBI, Privacy Impact Assessment: Integrated Automated Fingerprint Identification System (IAFIS)/Next Generation Identification (NGI) Repository for Individuals of Special Concern (RISC),

SCALIA, J., dissenting

The Court asserts that the taking of fingerprints was "constitutional for generations prior to the introduction" of the FBI's rapid computer-matching system. *Ante,* at 22. This bold statement is bereft of citation to authority because there is none for it. The "great expansion in fingerprinting came before the modern era of Fourth Amendment jurisprudence," and so we were never asked to decide the legitimacy of the practice. *United States* v. *Kincade*, 379 F. 3d 813, 874 (CA9 2004) (Kozinski, J., dissenting). As fingerprint databases expanded from convicted criminals, to arrestees, to civil servants, to immigrants, to everyone with a driver's license, Americans simply "became accustomed to having our fingerprints on file in some government database." *Ibid.* But it is wrong to suggest that this was uncontroversial at the time, or that this Court blessed universal fingerprinting for "generations" before it was possible to use it effectively for identification.

The Court also assures us that "the delay in processing DNA from arrestees is being reduced to a substantial degree by rapid technical advances." *Ante,* at 22. The idea, presumably, is that the snail's pace in this case is atypical, so that DNA is now readily usable for identification. The Court's proof, however, is nothing but a pair of press releases—each of which turns out to undercut this argument. We learn in them that reductions in backlog have enabled Ohio and Louisiana crime labs to analyze a submitted DNA sample in twenty days.[5]  But that is *still*

—————————

http://www.fbi.gov/foia/privacy-impact-assessments/iafis-ngi-risc  (searches of the "Unsolved Latent File" may "take considerably more time").

[5] See Attorney General DeWine Announces Significant Drop in DNA Turnaround Time (Jan. 4, 2013), http://ohioattorneygeneral.gov/ Media/News-Releases/January-2013/Attorney-General-DeWine-Announces-Significant-Drop; Gov. Jindal Announces Elimination of DNA Backlog

*longer* than the *eighteen* days that Maryland needed to analyze King's sample, once it worked its way through the State's labyrinthine bureaucracy. What this illustrates is that these times do not take into account the many other sources of delay.  So if the Court means to suggest that Maryland is unusual, that may be right—it may qualify in this context as a paragon of efficiency.  (Indeed, the Governor of Maryland was hailing the elimination of that State's backlog more than five years ago.  See Wheeler, O'Malley Wants to Expand DNA Testing, Baltimore Sun, Jan. 11, 2008, p. 5B.)  Meanwhile, the Court's holding will result in the dumping of a large number of arrestee samples—many from minor offenders—onto an already overburdened system: Nearly one-third of Americans will be arrested for some offense by age 23.  See Brame, Turner, Paternoster, & Bushway, Cumulative Prevalence of Arrest From Ages 8 to 23 in a National Sample, 129 Pediatrics 21 (2011).

The Court also accepts uncritically the Government's representation at oral argument that it is developing devices that will be able to test DNA in mere minutes.  At most, this demonstrates that it may one day be possible to design a program that uses DNA for a purpose other than crime-solving—not that Maryland has in fact designed such a program today.  And that is the main point, which the Court's discussion of the brave new world of instant DNA analysis should not obscure.  The issue before us is not whether DNA can *some day* be used for identification; nor even whether it can *today* be used for identification; but whether it *was used for identification here.*

Today, it can fairly be said that fingerprints really are used to identify people—so well, in fact, that there would

———————

(Nov. 17, 2011), http://www.gov.state.la.us/index.cfm?md=newsroom&tmp=detail&articleID=3102.

be no need for the expense of a separate, wholly redundant DNA confirmation of the same information. What DNA adds—what makes it a valuable weapon in the law-enforcement arsenal—is the ability to solve unsolved crimes, by matching old crime-scene evidence against the profiles of people whose identities are already known. That is what was going on when King's DNA was taken, and we should not disguise the fact. Solving unsolved crimes is a noble objective, but it occupies a lower place in the American pantheon of noble objectives than the protection of our people from suspicionless law-enforcement searches. The Fourth Amendment must prevail.

\*    \*    \*

The Court disguises the vast (and scary) scope of its holding by promising a limitation it cannot deliver. The Court repeatedly says that DNA testing, and entry into a national DNA registry, will not befall thee and me, dear reader, but only those arrested for "serious offense[s]." *Ante,* at 28; see also *ante,* at 1, 9, 14, 17, 22, 23, 24 (repeatedly limiting the analysis to "serious offenses"). I cannot imagine what principle could possibly justify this limitation, and the Court does not attempt to suggest any. If one believes that DNA will "identify" someone arrested for assault, he must believe that it will "identify" someone arrested for a traffic offense. This Court does not base its judgments on senseless distinctions. At the end of the day, *logic will out.* When there comes before us the taking of DNA from an arrestee for a traffic violation, the Court will predictably (and quite rightly) say, "We can find no significant difference between this case and *King.*" Make no mistake about it: As an entirely predictable consequence of today's decision, your DNA can be taken and entered into a national DNA database if you are ever arrested, rightly or wrongly, and for whatever reason.

The most regrettable aspect of the suspicionless search

that occurred here is that it proved to be quite unnecessary. All parties concede that it would have been entirely permissible, as far as the Fourth Amendment is concerned, for Maryland to take a sample of King's DNA as a consequence of his conviction for second-degree assault. So the ironic result of the Court's error is this: The only arrestees to whom the outcome here will ever make a difference are those who *have been acquitted* of the crime of arrest (so that their DNA could not have been taken upon conviction). In other words, this Act manages to burden uniquely the sole group for whom the Fourth Amendment's protections ought to be most jealously guarded: people who are innocent of the State's accusations.

Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school. Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

I therefore dissent, and hope that today's incursion upon the Fourth Amendment, like an earlier one,[6] will some day be repudiated.

---

[6] Compare, *New York* v. *Belton*, 453 U. S. 454 (1981) (suspicionless search of a car permitted upon arrest of the driver), with *Arizona* v. *Gant*, 556 U. S. 332 (2009) (on second thought, no).