Filed 2/4/19 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL JOSEPH MARQUEZ,<br><br>    Defendant and Appellant. | G048762<br><br>(Super. Ct. No. 08CF3587)<br><br>ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT; DENYING PETITIONS FOR REHEARING |

   This court hereby orders that the opinion filed herein on January 15, 2019, be modified as follows:

   1. On page 7, footnote 3, fourth line, the citation "(Cal. Const., art. I, § 28, subd. (d).)" is deleted and replaced with "(Cal. Const., art. I, § 28, subd. (f)(2).)"

   This modification does not change the judgment.

   Appellant's and respondent's petitions for rehearing are DENIED.


             MOORE, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G048762 |
|      v. | (Super. Ct. No. 08CF3587) |
| DANIEL JOSEPH MARQUEZ, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge. Affirmed and remanded with directions.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Enid A. Camps, Peter Quon, Jr., Parag Agrawal, Scott Taylor and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

In 2006, police arrested defendant Daniel Joseph Marquez in Ventura County on a drug possession offense. Without Marquez's consent, authorities collected his DNA sample and entered his DNA profile into a statewide database, but Marquez was never charged with the drug offense. In 2008, investigators retrieved DNA evidence from an Orange County robbery, and that evidence matched Marquez's DNA profile in the database (a "cold hit"). Police contacted Marquez, and with his consent they collected a second DNA sample, which matched the DNA evidence from the robbery.

The prosecution filed two robbery counts and a related offense. The trial court denied Marquez's motion to suppress the DNA evidence, and a jury convicted him of the charged offenses. The court sentenced Marquez to 25 years to life in state prison, plus an additional 15 years for three alleged prior serious felony convictions.

In an unpublished opinion, we held that the 2006 collection of Marquez's DNA was lawful under the Fourth Amendment. The Supreme Court ordered us to reconsider the cause in light of its later decision in *People v. Buza* (2018) 4 Cal.5th 658 (*Buza*). In *Buza*, the Court held that the collection of a DNA sample is lawful when a suspect is "validly arrested on 'probable cause to hold for a serious offense' . . . as 'part of a routine booking procedure.'" (*Id*. at p. 665, citing *Maryland v. King* (2013) 569 U.S. 435, 465 (*King*).)

In this opinion, we now hold that the 2006 collection of Marquez's DNA sample was unlawful under the Fourth Amendment; the prosecution failed to prove that Marquez was validly arrested or that his DNA was collected as part of a routine booking procedure. However, the trial court properly admitted the 2008 DNA evidence under a well-established exception to the exclusionary rule: the attenuation doctrine.

Additionally, due to a recent statutory change, we will remand the case for the trial court to consider striking the additional punishment for Marquez's three prior

serious felony convictions. We will also order the court to modify Marquez's custody credits. In all other respects, the judgment is affirmed.

I

FACTS AND PROCEDURAL HISTORY

In 2008, Marquez entered a bank in Laguna Hills stating, "I am armed. Give me all your large bills." Marquez had a leather bag that looked like a "CD organizer." A teller put small bills and "bait money" in the organizer. Two managers followed Marquez outside and tried to stop him. Marquez fought them off with a pocketknife, cutting the shirt of one of the managers. During the skirmish, Marquez dropped the organizer and a pair of glasses. From these items, investigators retrieved DNA evidence, which was later linked to Marquez.

*The Charges and the Motion to Suppress*

In 2012, the prosecution filed an information charging Marquez with two counts of second degree robbery and one count of assault with a deadly weapon. (Pen. Code, §§ 211, 245, subd. (a)(1)[1]; *People v. Estes* (1983) 147 Cal.App.3d 23.) The prosecution alleged five "'strike'" priors. (§ 1192.7.) The prosecution further alleged three prior serious felony conviction sentencing enhancements. (§ 667.)

Prior to trial, Marquez filed a motion to suppress evidence. (§ 1538.5.) Marquez argued that the collection of his DNA sample in 2006 violated the Fourth Amendment. Marquez sought to suppress all the "fruits" of the allegedly unlawful search. The prosecution filed an opposition arguing several grounds, including

---

[1] All further undesignated statutory references will be to the Penal Code.

3

attenuation. At the hearing on the motion, the prosecution called no witnesses. The parties submitted a written stipulation of the underlying facts.

*The Written Stipulation*

The parties' stipulation provided as follows:

"Defendant's DNA sample was obtained on October 3, 2006, without a warrant and without consent.

"[D]efendant was arrested for a violation of Health and Safety Code section 11350[, subdivision] (a) in Ventura County on September 29, 2006. [On] October 3, 2006, authorities from Ventura County collected a sample of defendant's DNA. The 'qualifying offense' listed for the taking of defendant's DNA is 'PC 459.' Defendant was never convicted of, or even charged with, the violation of section 11350 in Ventura County. However, defendant had previously been convicted of a felony violation of Penal Code section 459 (second degree burglary), in Orange County, on February 13, 1986.

"The DNA profile generated from the October 3, 2006 sample was entered into the California Department of Justice DNA Data Bank.

"On September 18, 2007, the defendant entered a guilty plea to a felony count of violating Health and Safely Code section 11350[, subdivision] (a) in Orange County . . . . He was placed on probation and ordered to submit to DNA testing pursuant to Penal Code section 296. . . .

"On February 25, 2008, the defendant admitted to violating his terms of probation after failing to appear for a court-ordered case review. He was reinstated on probation and again ordered to submit to DNA testing. [¶] . . . [¶]

"On October 21, 2008, the defendant admitted to a second violation of probation in Orange County . . . . He was reinstated on probation and again ordered to

4

submit to DNA testing."[2]

"On August 5, 2008, a pair of glasses and a leather organizer [were] left behind by a suspect at the scene of an alleged robbery. These items were collected by the Orange County Sheriff-Coroner Forensic Science Services. A single male DNA profile was discovered by the lab on both items. That profile was entered into the California Department of Justice DNA Data Bank and the defendant was identified as a candidate match. [¶] Based on this match, Orange County Sheriff's Deputy Steve Torres . . . determined that the defendant was currently on formal probation in Orange County and subject to a search and seizure condition. [¶] . . . [¶]

"On November 25, 2008, Orange County sheriff's deputies went to the last known address for the defendant . . . . At 1930 hours the defendant was subsequently located and detained. A hypodermic needle was located in his sock and he was arrested. At 2100 hours Deputy Torres contacted the defendant . . . about his involvement in the August 5, 2008 robbery. He also collected a DNA sample from the defendant using a buccal swab after obtaining defendant's voluntary consent. A DNA profile was generated from that collection which matched the profile found on the glasses and leather organizer recovered at the scene of the alleged robbery."

*Subsequent Proceedings*

The trial court denied Marquez's motion to suppress. The court held that Marquez's 2006 DNA sample was lawfully collected. Alternatively, the court held that the 2007 court order for Marquez to submit to DNA testing was an "independent

---

[2] Despite the three court orders, Marquez did not "submit to" further DNA testing until November 2008, when he was identified as a robbery suspect. According to the Attorney General, the Department of Justice had instructed local law enforcement agencies not to collect "duplicate" DNA samples. However, this information was not before the trial court, and it does not affect our analysis.

intervening event" and that the 2008 DNA evidence was therefore "attenuated." At trial, the prosecution presented evidence linking the DNA evidence recovered at the 2008 robbery to Marquez's 2008 DNA sample. There was no evidence presented at trial concerning Marquez's 2006 DNA sample.

The jury found Marquez guilty as to all of the charged counts. The court found true the five prior "strike" and the three prior serious felony conviction allegations. The court sentenced Marquez to 25 years to life, plus 15 years for the three prior serious felony enhancements.

On appeal, we affirmed Marquez's convictions. Marquez petitioned for review in the California Supreme Court, which issued a "grant and hold" order. The Court later transferred the case back to this court with directions to vacate our prior decision and reconsider the cause in light of *Buza*, *supra*, 4 Cal.5th 658.

II

DISCUSSION

Marquez contends: (A) the collection of his DNA sample in 2006 violated the Fourth Amendment, and any evidence discovered as a result should have been excluded; (B) a recent statutory change applies retroactively to his three prior serious felony convictions; and (C) he should be awarded additional custody credits. We shall address each contention in turn.

A. *The Motion to Suppress DNA Evidence*

When reviewing a ruling on a criminal defendant's section 1538.5 motion to suppress evidence, appellate courts defer to the trial court's factual findings under a substantial evidence standard. (*People v. Mays* (1998) 67 Cal.App.4th 969, 972.)

Appellate courts then independently apply those facts to determine if the search and/or seizure was reasonable under the Fourth Amendment. (*Ibid.*)

Here, at the hearing on Marquez's motion to suppress the DNA evidence the parties stipulated to the facts. Therefore, we will conduct a de novo review.

*1. The prosecution failed to prove that the 2006 collection of Marquez's DNA sample was lawful under the Fourth Amendment.*

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, . . . particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.) Under section 1538.5, a trial court may grant a motion to suppress evidence "only if exclusion is mandated by the federal Constitution." (*People v. Banks* (1993) 6 Cal.4th 926, 934.)[3]

The initial burden is on the defendant to establish that the government conducted a search without a warrant. The burden then shifts to the prosecution to justify the warrantless search. (*People v. Williams* (1999) 20 Cal.4th 119, 127 ["the prosecution has the burden of proving, if it can, some justification for a warrantless search"].) A warrantless search is presumptively unreasonable. (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 652-653.) The prosecution must prove by a preponderance of the evidence that the search falls within an exception to the Fourth Amendment warrant requirement. (*People v. Torres* (1992) 6 Cal.App.4th 1324, 1334-1335.)

_____

[3] The Attorney General concedes that the 2006 collection of Marquez's DNA sample violated the DNA Act that was in place at the time of his arrest (Marquez was not arrested for a qualifying crime). However, the suppression of evidence is not a remedy for violations of state law. (Cal. Const., art. I, § 28, subd. (d).) Therefore, our analysis is strictly concerned with the federal Constitution.

There are several well-established exceptions to the warrant requirement, including consent, a search incident to an arrest, and a routine booking search. (*Florida v. Jimeno* (1991) 500 U.S. 248, 250-251 ["we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so"]; *Illinois v. Lafayette* (1983) 462 U.S. 640, 643 ["it is reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police station house incident to booking" for safety and identification purposes]; *Michigan v. DeFillippo* (1979) 443 U.S. 31, 35 ["an arresting officer may, without a warrant, search a person validly arrested"].)

Following an arrest supported by probable cause, the collection of a suspect's DNA by taking a cheek swab during a routine booking procedure is now a valid exception to the warrant requirement. (*King*, *supra*, 569 U.S. 435.) In *King*, the United States Supreme Court analyzed Maryland's DNA Act. The Court held that a buccal swab (a cheek swab) — like any invasion of the body — is a "search" within the meaning of the Fourth Amendment, "gentle" though the search may be. (*King*, at p. 446.) The Court further identified a "legitimate government interest . . . that is well established: the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody." (*Id*. at p. 449.) Thus, the Court crafted a new exception to the warrant requirement, largely relying on the existing search incident to arrest and booking exceptions: "When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." (*Id*. at pp. 465-466.)

In 2018, our Supreme Court analyzed California's DNA Act, applying *King*, *supra*, 569 U.S. 435. (See *Buza*, *supra*, 4 Cal.5th 658.) In *Buza*, police arrested

8

defendant for setting fire to a police car and transported him to jail. During booking, defendant refused to submit to a cheek swab. A jury convicted defendant of two arson related counts and the "offense of refusing to provide a specimen required by the DNA Act." (*Id.* at p. 664.) At issue was: "Whether the statute's DNA collection requirement is valid as applied to an individual who, like defendant, was validly arrested on 'probable cause to hold for a serious offense' . . . and who was required to swab his cheek as 'part of a routine booking procedure' at county jail." (*Id.* at p. 665.) The Court upheld the DNA Act as *applied to defendant*, but left open "for another day" Fourth Amendment "concerns about the potential application of the DNA Act in other cases involving other, differently situated arrestees." (*Buza*, *supra*, 4 Cal.5th at pp. 681, 693.)

Here, the bare record at the suppression hearing (the written stipulation) established that Marquez was arrested in Ventura County on September 29, 2006, for possessing a controlled substance. (Health & Saf. Code, § 11350, subd. (a).) The stipulation does not state whether this was a suspected misdemeanor arrest or a suspected felony arrest, but for Fourth Amendment purposes, the prosecution minimally established that Marquez was arrested for a "serious" offense. (See *People v. Thompson* (2006) 38 Cal.4th 811, 824 ["the significant distinction for Fourth Amendment purposes in an analogous context is whether the crimes were "'jailable'" or "'nonjailable'"'"].)

However, the prosecution failed to prove by a preponderance of the evidence that Marquez was validly arrested in 2006. We are presented with the very situation that our Supreme Court declined to address in *Buza*; that is, there is nothing in the record to indicate that Marquez's 2006 arrest was supported by probable cause. (See *Buza*, *supra*, 4 Cal.5th 658.) Indeed, the record reveals that no charges were ever filed. There may be variety of reasons for this; perhaps the police did not file the case with the district attorney, or perhaps the district attorney chose not to file charges. In any event, it

9

is a reasonable inference that at the time of his arrest in 2006, there were no reasonable grounds to believe that he was guilty of any "serious" or "jailable" crimes. (See *People v. Celis* (2004) 33 Cal.4th 667, 673 ["""The substance of all the definitions of probable cause is a reasonable ground for belief of guilt"""].)

Moreover, the collection of Marquez's DNA sample occurred on October 3, 2006, which was *four days after his arrest* on September 29, 2006. Given the unexplained delay between Marquez's arrest and his DNA collection, we also do not know whether the 2006 collection of Marquez's DNA sample (presumably a buccal or cheek swab) was "part of a routine booking procedure" at a local jail. (Compare *Buza*, *supra*, 4 Cal.5th 658 [defendant refused to provide his DNA sample during the booking process at the county jail immediately following his arrest].) [4]

In sum, the prosecution failed to establish that the 2006 DNA collection of Marquez's DNA sample fell within an exception to the warrant requirement. Thus, the warrantless search violated the Fourth Amendment. Nevertheless, we must now analyze whether the 2008 DNA evidence should have been excluded.

*2. The trial court properly admitted the 2008 DNA evidence because it was sufficiently attenuated from the unlawful 2006 collection of Marquez's DNA sample.*

The Fourth Amendment protects against unreasonable searches and seizures, but it does not include a remedy when the police violate its provisions.

---

[4] Generally, when there is an arrest without a warrant, the arrestee must be brought before a magistrate within 48 hours for a finding of probable cause; the finding ordinarily occurs at arraignment. (§ 988; *County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 57.) But because of the delay in Marquez's DNA collection, the fact that no charges were filed, and the overall paucity of the record, we cannot presume that such a hearing occurred. (See Evid. Code, § 664 ["It is presumed that official duty has been regularly performed. This presumption does not apply on an issue as to the lawfulness of an arrest if it is found or otherwise established that the arrest was made without a warrant"].)

10

Therefore, the Supreme Court developed an "exclusionary rule," which generally prohibits evidence obtained in violation of the Fourth Amendment from being used in criminal trials. (*Mapp v. Ohio* (1961) 367 U.S. 643, 650-651; *Weeks v. United States* (1914) 232 U.S. 383, 389.) The purpose of the exclusionary rule is to deter governmental misconduct: "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the [Fourth Amendment] guaranty in the only effectively available way—by removing the incentive to disregard it." (*Elkins v. United States* (1960) 364 U.S. 206, 217.)

However, the fact that a Fourth Amendment violation has occurred does not automatically require the application of the exclusionary rule. (See *Herring v. United States* (2009) 555 U.S. 135, 140.) "Indeed, exclusion 'has always been our last resort, not our first impulse.'" (*Ibid.*) "We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." (*Id.* at p. 141.)

The exclusion of evidence is not a "'but for'" test. (*Hudson v. Michigan* (2006) 547 U.S. 586, 592.) "''[N]ot . . . all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'''" (*People v. Brendlin* (2008) 45 Cal.4th 262, 268 (*Brendlin*).)

Accordingly, the Supreme Court has created exceptions to the exclusionary rule, including the attenuation doctrine. (*Utah v. Strieff* (2016) __ U.S. __ [36 S.Ct. 2056, 2061] (*Utah*); see *Wong Sun v. United States* (1963) 371 U.S. 471.) Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional

11

guarantee that has been violated would not be served by suppression of the evidence obtained.'" (*Utah*, *supra*, __ U.S. __ [136 S.Ct. at p. 2061].)  In other words, exclusion of the evidence is not required when the connection between the unlawful activity and the evidence in question becomes "'so attenuated as to dissipate the taint.'"  (*Murray v. United States* (1988) 487 U.S. 533, 537.)

The Supreme Court has identified three factors that are used to determine whether the illegality (the poisonous tree) has become sufficiently attenuated to permit the admission of the obtained evidence (the fruit).  (*Utah*, *supra*, __ U.S. __ [136 S.Ct. at p. 2062].)  First, courts consider the "'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search"; this factor only favors attenuation if "'substantial time'" has elapsed.  (*Ibid*.)  Second, courts consider "the presence of intervening circumstances."  (*Ibid*.)  "Third . . . [courts] examine 'the purpose and flagrancy of the official misconduct.'"  (*Ibid*.)  This third factor is particularly significant because "[t]he exclusionary rule exists to deter police misconduct," and exclusion is favored "only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant."  (*Id.* at p. __ [136 S.Ct. at p. 2063].)

Our Supreme Court's decision in *Brendlin* illustrates the doctrine's application.  In *Brendlin*, an officer saw a vehicle with a temporary operating permit and made a traffic stop.  (*Brendlin*, *supra*, 45 Cal.4th at p. 265.)  The officer encountered a passenger, who had an outstanding arrest warrant.  During a search, officers found drug paraphernalia.  (*Id*. at p. 266.)  It was undisputed that the traffic stop was unlawful, but the California Supreme Court determined that the evidence need not be suppressed. (*Id*. at p. 269.)  While there were "only a few minutes" between the unlawful stop and the lawful search incident to arrest, the court found that the "temporal proximity" factor was outweighed by the other two.  (*Id.* at p. 270.)  The court reasoned that the existence of the

12

arrest warrant "is an intervening circumstance that tends to dissipate the taint caused by an illegal traffic stop." (*Id*. at p. 271.) As to the third factor—flagrancy of the misconduct—the record did not show that the officer acted with an improper motive in making the traffic stop. (*Ibid*.) Thus, the court concluded that the combined circumstances "sufficiently attenuated the connection between the unlawful traffic stop and the subsequent discovery of the drug paraphernalia." (*Id*. at p. 272.)

Here, when we apply the three factors—temporal proximity, intervening circumstances, and the flagrancy of the misconduct—we conclude the 2006 unlawful collection of Marquez's DNA sample was sufficiently attenuated from the 2008 "cold hit" linking Marquez to the robbery and the lawful 2008 collection of his DNA sample.

First, as to temporal proximity, a substantial period of time (about two years) had elapsed between the unlawful collection of Marquez's DNA sample in 2006 and the lawful collection of DNA evidence in 2008. (Compare *Brendlin*, *supra*, 45 Cal.4th at p. 270 [temporal proximity of "only a few minutes"].) Second, as to intervening circumstances, between 2006 and 2008, Marquez had been arrested at least three times and had been ordered to submit to DNA testing on each occasion; moreover, at the time of Marquez's 2008 DNA collection, he was on felony probation and consented to the cheek swab. Finally, as far as the flagrancy of the misconduct, while the Attorney General concedes that the authorities were not statutorily authorized to collect Marquez's DNA in 2006, there is nothing to indicate that they acted with an improper motive, or that they somehow obtained the DNA sample in an inappropriate manner.

Marquez argues that the attenuation argument has been forfeited "because the prosecution never raised this contention in the trial court." Marquez is mistaken. The prosecution raised this contention in its written opposition to the motion. Moreover, the attenuation doctrine was further addressed—and relied upon—by the trial court in its ruling on the motion.

13

In sum, there was a substantial time break, as well as intervening circumstances and a lack of evidence concerning flagrant official misconduct. We conclude that the DNA evidence lawfully collected from Marquez in Orange County in 2008 is sufficiently attenuated from the DNA evidence unlawfully collected in Ventura County in 2006. Thus, the trial court properly denied Marquez's motion to suppress evidence.

## B. *Retroactive Application of Legislative Change*

The trial court imposed three prior serious felony enhancements under section 667, subdivision (a)(1), which provides: In compliance with subdivision (b) of Section 1385, "[a]ny person convicted of a serious felony who previously has been convicted of a serious felony . . . shall receive . . . a five-year enhancement for each such prior conviction . . . . The terms of the present offense and each enhancement shall run consecutively."

Prior to January 1, 2019, section 1385, subdivision (b), provided: "This section does not authorize a judge to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667." However, after January 1, 2019, as amended by Statutes 2018, Chapter 1013, section 2, the law now provides: "If the court has the authority . . . to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice . . . ." (§ 1385, subd. (b)(1).)

The amended version of section 1385, subdivision (b)(1), applies to Marquez because his case is not yet final on appeal. (See *People v. Francis* (1969) 71 Cal.2d 66, 69-70; *In re Estrada* (1965) 63 Cal.2d 740, 742-743.) The trial court therefore now has discretion to impose a lesser punishment.

14

The Attorney General concedes the amended version of section 1385, subdivision (b)(1), is retroactive but contends remand would be futile.  We are not certain that is the case.  We therefore remand this issue to the trial court for its consideration.  Of course, we take no position on the merits.

*C.  Custody Credits*

The trial court awarded Marquez credit for 1,602 actual days served and 240 days of conduct credit, for a total of 1,842 days.  Marquez argues that the trial court should have awarded him credit for 1,906 days.

Marquez was taken into custody on December 24, 2008.  At the time of sentencing, he had been in custody for 1,658 actual days.  That number, multiplied by 15 percent, equals 248 days—the number of days of conduct credit defendant should have received under section 2933.1.  Consequently, Marquez's total custody credit award should have been 1,906 days (the sum of 1,658 and 248 days).  (§§ 2900.5, 2933.1.)

The Attorney General concedes the issue and we agree.

III

DISPOSITION

The matter is remanded to the trial court to consider whether to exercise its discretion to strike the punishment for any or all of Marquez's three prior serious felony convictions.  (§§ 667, 1385, subd. (b)(1).)  The court is further directed to adjust Marquez's custody credits as discussed, and to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation as directed within this opinion.

15

In all other respects, the judgment is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

16